IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CASE NO.: 1:26-cv-2735

RUSSELL ALFORD,
Address filed under seal;
GINA BISIGNANO,
Address filed under seal;
DONNA SUE BISSEY,
Address filed under seal;
WILLIAM COTTON,
Address filed under seal;
JOSHUA RYAN DALE,
Address filed under seal
QUINN KEEN,
Address filed under seal;
CAROL O'NEAL KICINSKI,
Address filed under seal;
DEREK KINNISON,
Address filed under seal;
MATTHEW MARTIN,
Address filed under seal;
KATHERINE MORRISON,
Address filed under seal;
ANNA MORGAN-LLOYD,
Address filed under seal;
JOSHUA YOUNGERMAN,
Address filed under seal;
TUCKER ANDREW WESTON,
Address filed under seal;
and JON NICHOLAS HENEGHAN,
Address filed under seal;

       Plaintiffs,

v.

UNITED STATES OF AMERICA,
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

       Defendant.

_____/

## COMPLAINT PURSUANT TO THE FEDERAL TORT CLAIMS ACT

The Plaintiffs, Russell Alford, Gina Bisignano, Donna Sue Bissey, William Cotton, Joshua

Ryan Dale, Quinn Keen, Carol O'Neal Kicinski, Derek Kinnison, Mathew Martin, Katherine Morrison, Anna Morgan-Lloyd, Joshua Youngerman, Tucker Andrew Youngerman, Tucker Andrew Weston and Jon Nicholas Heneghan, (hereinafter collectively referred to as the "J6ers"), by and through their undersigned counsel, hereby file their Complaint against the Defendant, the United States of America, and allege as follows:

## Jurisdiction and Venue

1.      This Court has subject-matter jurisdiction pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA) and 28 U.S.C. § 1331 (federal question).

2.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1402(b) because most of the acts and omissions giving rise individually to each of the Plaintiffs' claims occurred in this District, where the supposed infringements occurred at the Capitol and prosecutions were initiated, investigated, and litigated.

## Exhaustion of Administrative Remedies

3.      Pursuant to 28 U.S.C. § 2675(a), the J6ers timely filed administrative claims with the United States, the Federal Bureau of Investigation or other appropriate federal agencies and they have fully exhausted all administrative remedies required by the Federal Tort Claims Act ("FTCA").  More than six months have elapsed since the presentment of the SF-95 claim forms without final disposition by the agencies, or the claims were denied.

## Parties

*Plaintiffs*

4.      The Plaintiff, Russell Alford, is a citizen of the state of Alabama.  He attended the January 6, 2021, political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia. He was sentenced to 365 in federal prison and

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

suffered serious physical injuries and denial of medical care while incarcerated. Details of the tortious conduct committed against him are set forth below.

5.      The Plaintiff, Gina Bisignano, is a citizen of the state of California, where she owned and operated a successful Beverly Hills beauty salon prior to January 6, 2021.  After a few minutes of protest behavior on January 6, her business, life, health and career were destroyed. Details of the tortious conduct committed against her are below.

6.      The Plaintiff, William Cotton, is a citizen of the state of Rhode Island. He attended the January 6, 2021, political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia. Details of the tortious conduct committed against him are set forth below.

7.      The Plaintiff, Derek Kinnison, is a citizen of the State of California. He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted for crimes such as conspiracy, obstruction of an official proceeding, and tampering with documents (for erasing HIS OWN chat messages).  He never entered the Capitol building.  Yet he was charged with felony obstruction.  Details of the tortious conduct committed against him are set forth below.

8.      The Plaintiff, Katherine Morrison, is a citizen of the United States. She attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia. Details of the tortious conduct committed against her are set forth below.

9.      The Plaintiff, Anna Morgan-Lloyd, is a citizen of the state of Indiana. She attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia.  She was the first January 6, 2021 defendant to be sentenced. She was represented by H. Heather Shaner, a CJA panel attorney whose

3

representation was constitutionally deficient. Details of the tortious conduct committed against her are set forth below.

10.    The Plaintiff, Donna Sue Bissey, is a citizen of the state of Indiana.  She was a co-defendant of Anna Morgan-Lloyd and was the second January 6, 2021 defendant to be sentenced. Details of the tortious conduct committed against her are set forth below.

11.    The Plaintiff, Quinn Keen, is a citizen of the state of Illinois.  He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia.  He was a victim of Sedition Hunters and was subjected to unlawful biological data collection.   Details of the tortious conduct committed against him are set forth below.

12.    The Plaintiff, Joshua Ryan Dale, is a citizen of the state of North Carolina. He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia.  He was a victim of Sedition Hunters and suffered serious deprivations of medical care while incarcerated.  Details of the tortious conduct committed against him are set forth below.

13.    The Plaintiff, Matthew Martin, is a citizen of the state of New Mexico.  He is an electrical engineer who worked for a contractor connected to the Nevada National Security Site and Los Alamos support work.  He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia. He was fully acquitted of all charges at trial. Details of the tortious conduct committed against him are set forth below.

14.    The Plaintiff, Joshua Youngerman, is a citizen of the state of California.  He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

in the United States District Court for the District of Columbia.  Details of the tortious conduct committed against him are set forth below.

15.    The Plaintiff, Tucker Andrew Weston, is a citizen of the State of Washington.  He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia. Details of the tortious conduct committed against him are set forth below.

16.    The Plaintiff, Carol O'Neal Kicinski, is a citizen of the state of Florida, residing in Dunedin, Pinellas County. She is the founder of Simply Gluten Free magazine and website, a nationally syndicated television chef, and a cookbook author.  She attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia (Case No. 1:22-cr-00061-RBW).  Details of the tortious conduct committed against her are set forth below.

17.    The Plaintiff, Jon Nicholas Heneghan, is a citizen of the state of Florida, residing in the Tampa Bay area.  He is a professional poker player and 2005 World Series of Poker bracelet winner.  He attended the January 6, 2021 political rally in Washington, D.C. and was subsequently prosecuted in the United States District Court for the District of Columbia (Case No. 1:22-cr-00061-RBW).  Details of the tortious conduct committed against him are set forth below.

*Defendant*

18.    The Defendant, United States of America, is sued under the FTCA for the tortious acts and omissions of its employees, including Capitol Police, Washington, D.C. Metropolitan Police Attorney General Merrick Garland, U.S. Attorney Matthew Graves, FBI Director Christopher Wray, and Assistant U.S. Attorneys Ashley Akers, Victoria Sheets, and Candace Wong, acting within the scope of their federal employment.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

## The Biggest Crime in American History

### *Prefatory Statement*

19.    The J6ers are patriotic American citizens who witnessed, as did most of the nation, the reporting on the Presidential Election of 2020 (hereinafter referred to as the "Election").  As is explained below, each of the Plaintiffs knew and understood by what they saw and learned that the Election had been rigged and they were concerned that their country was being wrongfully taken.

20.    On January 6, 2021 (hereinafter referred to also as "January 6th" or "J6"), the protesters who were in attendance on the Capitol grounds and/or building (hereinafter referred to as the "J6ers") innocently traveled to Washington, D.C. as they were anxious to learn whatever they could and to connect with like-minded patriots who had the same concerns and who were there to peacefully protest the rigging of the Election.  For almost all of the J6ers, their involvement was peaceful as they stood in groups who were in prayer and/or who sang patriotic songs such as *God Bless America*.

21.    Unfortunately, the events which started peacefully turned into mayhem.  On the West side of the Capitol Building, Metropolitan Police began to bombard the crowds with teargas and percussion grenades.  Ultimately, they used SG gas, and everything went from bad to worse, resulting in four deaths and other injuries to J6ers, while the Capitol Police and the Metropolitan Police suffered only a few minor injuries, such as one who had a broken finger.

22.    J6ers were waived into the Capitol Building by the Capitol Police, and for the most part, they acted peacefully.

23.    Yet, after the events of the day, false news was circulated of 5 deaths of police officers and accusations that the J6ers were insurrectionists.  Ultimately, the Garland DOJ prosecuted the J6ers in dreadful ways, in conjunction with the District Court judges and magistrate

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

judges who worked together to wrongfully imprison and wrongfully try and sentence innocent J6ers and others.

24.     In this regard, only one Magistrate Judge showed any connection with those responsible for the rigging of the Election.  Other than that one individual, who may or may not have influenced the rest of the D.C. federal bench, there is no evidence that the judges of the court consciously knew that they were aiding and abetting the enemy.  The wrongdoing done by the bench was probably far more innocent than many suspect, as it was the nature and purpose of the occurrences on January 6th.

25.     What the federal bench and the rest of the American people did not know was that the events which occurred on January 6th did not begin on that date.  In fact, the breaking of the windows of the Capitol Building and the inducing of the J6ers to enter the grounds and the building had been planned long before Election Day.

26.     To understand what occurred, one must zoom out to the proverbial 30,000 feet and understand the historical and global context of what occurred.  The population of the United States is approximately 4% of the world's population, and yet, it has approximately 27% of the global GNP.  Following World War II, the United States has been the most powerful economy and military force on Earth, and remains so to this day, despite foreign and domestic influences which are intended and determined to destroy the United States.

27.     For many decades the government of the United States encouraged endless wars, exporting of our manufacturing base, and movement toward global governance.

28.     As a result, foreign powers, especially China, prospered and fundamental institutions of the United States became infiltrated by both foreign interests and domestic actors whose interests aligned with global governance.

7

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

29.     Over time, in the last decades, global interests have infiltrated and become more common and more involved in different governmental agencies, and normal American life, including the American educational system from K-1 through higher learning; the American traditional media; most of social media; aspects of big business; and certain churches.

30.     Before Donald J. Trump came to office, although there were differences between the American political parties, each subscribed to these policies, supporting by example, the U.N., W.H.O., the World Economic Forum, and globalism.  Donald J. Trump presented a fundamental change to "America First" and to "Make America Great Again," or "MAGA," and a majority of Americans responded to the call to conservatism and nationalism.

31.     In effect, Donald J. Trump emerged to control the Republican Party which had its base disgorged, leaving that globalist minority knows as "Republicans in Name Only" or "RINOs" as a minority.  Meanwhile, the Democrat Party held the banner of globalism to the extent that its policies were extreme.  For example, it embraced the U.N., W.H.O., the World Economic Forum, China, and open borders.  In fact, it encouraged virtues of utopia, where all people are equal and programs such as being Woke, or embracing "Diversity, Equity, and Inclusion," or "DEI," were pitted against conservatism and making America First.

32.     As a result of the dichotomy between the ways of Donald J. Trump and the Globalists, the nation became emotionally divided where hatred toward Donald J. Trump actually was given an unofficial but well-known psychological designation in the MAGA counterculture of "Trump Derangement Syndrome," and while the conservatives are constrained by beliefs which required adhesion to the doctrines of religion, the U.S. Constitution, and the rule of law, the Globalists, though greatly outnumbered, are not so constrained.

33.     As Donald J. Trump was consolidating his base in the Republican Party, the

8

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Globalists rose in influence and control of the Democrat Party, giving them more than a base. It gives them a means of gaining and taking control of the United States.

34.    At this juncture, the Globalists have not only infiltrated the Democrat Party, but it has infiltrated all aspects of government including members of our judiciary and the U.S. Department of Justice, and they are active.

35.    While the social tide was changing in the United States, foreign states, primarily China, Venezuela, and Serbia, together with anti-American interests, such as George Soros, Bill Gates, and the World Economic Forum, encouraged their efforts to cause confusion among Americans which played into the divergence of values. DEI became the Woke philosophy with an appearance of legitimacy for ideas which sometimes defied common sense. For instance, Boards of Education in various counties permitted and sometimes encouraged young children who were normal, and capable to being influenced to believe that they were of the opposite sex. This liberalization grew to the point where male-to-female transitioners would participate in women's sports to break all kinds of records.

36.    For another example, of how the Left and the Right are incompatible. Where the Conservatives are in favor of equal opportunities for all races, the Globalists seek repentance from Caucasian males for bad acts supposedly of some of their ancestors.

37.    In 2016, Donald J. Trump won the Presidential race. Instantaneously, false narratives were made and given credence, such as the "Russia Coalition" accusations against President Trump. Some Globalist FBI agents considered a plan to have a special prosecutor appointed to be an "insurance policy," the appointment of Meuller who spent $30 million investigating, came up empty. Instead of unearthing Russian collusion and other crimes, Donald J. Trump was proven to have been law abiding.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

38.    However, the 2016 election of Donald J. Trump did lead to a great deal of social unrest and during the four years of his first term, a large percentage of Americans became susceptible to believing in positions contrary to the American way.  These people formed a base in our society which foreign interests were able to wittingly and unwittingly enlist.

39.    Worse were systems by those who governed China, Venezuela, Serbians, and others who developed machines with programs by which the outcome of the Election could be manipulated and determined.

40.    Before 2020, the election equipment had been partially utilized, but in 2020, the foreign governments and all of their accomplices were set to rig the Presidential Election, and that is exactly what occurred.  The election was rigged, and all who participated directly were guilty conspiring to overthrow the government of the United States by force, which was sedition pursuant to 18 U.S.C. §§ 2384; which was also the inciting, assisting, and engaging in insurrection against the authority of the laws of the United States a conspiracy to commit insurrection pursuant to 18 U.S.C. §§ 2383; which was also adhering to the enemies of the United States and giving them aid and comfort by participating in the takeover of the United States to commit conspiracy to commit treason pursuant to 18 U.S.C. §§ 2381.

41.    In the case at bar, the general meeting of minds of groups which already existed, where the members of the groups, such as the D.C. Metropolitan Police, the Capitol Police, the lawyers who were part of the DOJ, the prison officials, and others who worked together for the common purpose of defeating the United States of America, or to cover-up the rigging of the 2020 Presidential Election were guilty of sedition, insurrection, and treason.

42.    As the enemies of the United States who participated in the massive foreign interference of the United States Presidential Election had made great infiltration of American

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Society, judges, attorneys, and other groups perhaps thought that they were doing a good thing by attempting to defeat the interests of the United States, but they were doing wrong, and acting against the interests of the government of the United States, which at the time was led by President Donald J. Trump.

*The Rigged Presidential Election of 2020*

43.     This Complaint concerns a part of the planning, execution, and follow-up of the most widespread, most pervasive, most deep-seated, and overall, the greatest anti-American conspiracy in history by American citizens and other domestic participants, who worked cohesively for the best interests of foreign powers and to take over the government of the United States, not through overt military invasion, but rather by the insidious and surreptitious infiltration of the election system of the United States.  The Americans who participated in this planning and execution of the planned events were participating in nothing less than a conspiracy to commit sedition, insurrection, and treason.

**The Development of the Enemy's Capability**

44.     Following World War II, the United States became avid opponents of tyranny and Communism, contrary to other nations including China and Venezuela, which had become adversaries to the United States before the turn of the 21st Century.

45.     In the early 2000's, the leader of Venezuela, Hugo Chavez, developed coding for voting machines by programmers located in Serbia which could control the results of elections which were tabulated on machines made in China for the companies of Sequoia and Smartmatic.

46.     In the year 2000, in Florida, ballots for the Presidential Election used chads which ultimately led to a failure of public confidence in punch voting machines and a substitute was in demand.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

47.    Meanwhile, the President of Venezuela, Hugo Chavez, was extremely unpopular and had been developing voting equipment which could be programed to cause the tabulation of the votes to be manipulated.  In August of 2004, voting equipment was implemented in Venezuela for a recall election of President Chavez.  Due to the machines, instead of being removed from office, Chavez won with 58% of the vote.  By 2006, the machines programmed by Serbians for the Venezuelans had made their way to the United States where they were implemented for the 2008 Democrat primaries.

48.    Over the next 14 years, the corrupted election equipment was sold to county clerks and other election officials throughout the United States.  Contrary to what the companies, Smartmatic USA Corporation, Dominion Voting Systems, ES&S, and others, said, the machines were not "air gapped," meaning unable to communicate with other computers.  In fact, the ES&S tabulators actually had phone chips, as cell phones do, on the motherboards and Dominion equipment were connected through VPN connections.

49.    After Donald J. Trump won the Presidential Election in 2016, and it was clear he was going to change the *status quo* in terms of ending perpetual wars and shifting power from those in the government who controlled decisions to the office of the President, deep state individuals, especially some in the Democrat Party, and foreign governments, including a number in the EU, Britain, and others, perpetrated a fraud on the American people accusing President Trump of collusion with Vladimir Putin.  When that attack on the Trump government of the United States failed, accusation after accusation causing impeachment and criminal charges to be brought were all part of the plan to return the government to one more friendly and cooperative to the goals of China, the EU, and Great Britian.

50.    Ultimately, the direction of the free world, in fact, the whole world, was to rest on

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the question of whether Donald J. Trump would be reelected in 2020. As it was obvious that Donald J. Trump would have trounced his opponent, Joseph Biden, who campaigned from his basement, and had a rally where 6 cars showed up, it became necessary for the foreign actors and domestic insurgents to use all efforts to rig the 2020 Presidential Election.

51.    As a result, in 2020, the United States witnessed the "Summer of Love," which was a plan to implement civil unrest in Left wing cities, to which paid activists were employed.

52.    Moreover, in the Autumn of 2019. A virus had been released from a laboratory in Wuhan, China. After the population of Wuhan was greatly infected, all commercial flights to all other cities in China from Wuhan were stopped. However, flights to the United States and Western Europe were encouraged. In this way, China intentionally attacked the United States with a biological weapon, knowing that it would cause massive deaths and a great change in the course of the 2020 U.S. Presidential Election.

53.    As a result of the pandemic, states caused the rules to change, often illegally, and mail in ballots were permitted to an extent which could change the results of the Election from ballot harvesting and other methods of cheating. The machines, though, had the power to determine the results of the elections by ginning-up more votes than could ever be needed.

54.    The rigging of the 2020 Presidential Election involved ballot harvesting and applying ballots in various races which were not provided by voters, either in person or by mail, but rather, were extra ballots prepared by criminals who put the ballots through the tabulators. Also, election equipment, such as the tabulators, although proclaimed by their manufacturers to be "air gapped," were connected to data centers which manipulated the vote tallies, either through actual phone chips on the motherboards of the tabulators or through virtual private networks.

55.    On the evening of November 3, 2020, Election Day, in 4 swing states, Donald

13

Trump was ahead, and for no known reason, even though the counting of ballots had never been previously stopped in any state, in the 4 swing states, the counting was stopped. Then, while the counting was supposedly not occurring, there were additional votes counted over an instant, causing the graphs of the voting in each of those swing states to show a straight vertical line for Biden. As a result, the following morning, in each of the 4 swing states, Joe Biden was suddenly ahead. In all 4 swing states, the graph was very similar where Joe Biden received approximately 97% of the vote, which was not only statistically impossible, but it was obvious to most that something untoward had occurred.

56.     Those who were not blinded by hatred toward Donald Trump were able to see instantly that the election results had been manipulated.

57.     More evidence of the election fraud emerged including the video from a camera which had been on the ceiling of the counting room in Fulton County, Georgia. There, the counting was stopped late on November 3, 2020, because of false reports of a broken watermain. In fact, contrary to the excuse to stop the counting in Fulton County, Georgia, no watermain broke or was in need of repair. After it was thought by the public that everyone left the counting room, 4 people remained behind and they reached under the tables which were aproned to conceal what was under them. The 4 people in the room pulled hidden suitcases out from under the tables. They opened the suitcases which were filled with unfolded (therefore not mailed) ballots which they then proceeded to put through the ballot tabulators over and over again.

58.     Those who looked objectively at these issues were not fooled and they knew that the election system of the United States had been manipulated to give false conclusions of the tallies.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

*Groups of Conspirators*

59.    The individuals who created the theft of the Election involved leadership and actors who were engaged in ballot harvesting, manipulation of the adjudication of votes, and mainly in regard to the programing and manipulation by computers of the Election tallies. All of those individuals were seditionists and insurrectionists, and the American citizens who participated were traitors to the United States.

60.    Over the last decades, more and more people have been swayed to help the foreign interests who are attempting to defeat the United States. For instance, the educational system of the United States is, to a great extent, now controlled by Globalist Woke leadership, which is politically engaged against the Trump government, which is the government of the United States.

61.    This does not make all members of such groups seditionists, insurrectionists, or traitors. However, once 2 or more Americans agree to take action against the interests of the United States, and one of the group performs an act in furtherance of their anti-American activities, they are part of a conspiracy to commit an insurrection, and they are guilty of a conspiracy to commit treason.

62.    In this regard, there are numerous actors who may have never met or conferred with the architects of the insurrection against President Donald Trump, but who acted in concert for the same ends. These include the group of individuals who planned the events of J6 or participated in the planning and execution of the events, and the prosecution of the aftermath.

63.    When the police acted in concert against the J6ers, they were acting as conspirators to effect the foreign takeover of the United States by going along with the plan. In this regard, the FBI, placed 274 agents and informants on the grounds of the Capitol to cause protestors to enter the Capitol Building. Those events of J6, especially those who were inducing the J6ers to enter

15

the building, went all the way to the top, including Attorney General Garland and Director of the FBI Wray, who were acting as co-conspirators against America, making them traitors to the United States.

64.     The Assistant U.S. Attorneys who pursued the J6ers with a vengeance because the J6ers supported President Trump also were their own group of co-conspirators who committed treason.

65.     The efforts of those who orchestrated the violence and the walking into the Capitol Building on January 6th was done so effectively that sensible law-abiding individuals, such as the chief judge of the District of Columbia, in Washington D.C. who laid down the way that J6ers' cases should proceed, was apparently convinced that the J6 Defendants in her courts were the insurrectionists who stormed the Capitol Building.  It is difficult to blame her for her reactions to the events which were perpetrated to fool the whole of the American public.  It fooled the judiciary, too.

66.     As such, at best, the Federal District Court Judges and Magistrate Judges who went along with the wrongful conduct were playing into the hands of the true insurrectionists who had planned J6 well in advance of that date.  There was no reason for the judges, at that point, to even imagine that someone had previously planned to break the windows of the Capitol Building, to enter the building, and to have 274 FBI agents and informants present to induce the crowd to proceed toward the Capitol Building and to enter it.

***The Planning of Related Events***
***Relating to the Rigged Election***

67.     The covert infiltration into our election system would not have been complete without finding ways of curtailing those of the U.S. population who were expected to question the

16

results of the Election and possibly generate an effective opposition to those who rigged the Election.

68.    Part of the plan was to identify and limit the effectiveness of those who could upset the proverbial applecart of the devised election rigging.  In that regard, plans were made to prosecute American citizens in authority and their attorneys who would possibly undermine the new government, the Biden government which was to be put into place.  As a result, certain individuals, such as Tina Peters, Stefanie Lambert, Matthew DePerno, and others were prosecuted for alleged election related crimes where the prosecutors had to twist the law because no crimes were actually committed.  Those victims of the conspiracy were attempting to preserve the evidence or maintain the truth of what had occurred.  They were heroic American patriots, not criminals.

69.    Moreover, the companies which manufactured and/or sold the corrupted election equipment would file lawsuits against anyone who criticized their machines.  Ultimately, lawsuits were filed against patriots such as Michael Lindel, Patrick Byrne, Joseph Oltmann, the Trump Campaign, and many more.

70.    Of utmost importance, all the rest of the opposition to the preposterous idea that Joe Biden emerged from his basement to be the victor with more votes than Barak Obama received needed to be nipped in the bud with slogans such as calling allegations of election fraud the "Big Lie," getting all lawsuits claiming election fraud dismissed before any evidence was presented.

71.    Some who were falsely put in trusted positions, but who were actually moles waiting to be utilized, such as William Barr, the Attorney General of the United States, suddenly took positions contrary to Donald Trump.  William Barr, for instance, just prior to his appointment as Attorney General, had been a partner of the law firm Kirkland Ellis, which represented Staple

17

Street, which had purchased Dominion.  He made public pronouncements that he did not see any indications of election fraud.  Unfortunately, this was trickery, as he gave the impression that the Department of Justice looked for such fraud and were not able to find any.  In fact, he was being deceptive in that he failed to also advise that he never looked.

*J6 was a Psy-Op*

72.      Of all the plans to take over the United States by infiltrating our election systems, one of the greatest was to commit a psychological operation, a "psy-op" against the protestors who the seditionists, insurrectionists, and traitors knew would be traveling to the Capitol Building in Washington, D.C. on January 6, 2021, the J6ers.

73.      Although the foreign intervention in the election, itself, is not the subject of this Complaint, the conspiracy to wreak havoc at the U.S. Capitol on January 6th, and use those events to cause an aftermath of harm to those patriots who attended at the U.S. Capitol on that fateful date was planned in advance and executed according to plan as part of the general scheme to take over America.

74.      The Globalists knew that those true to Donald Trump would be traveling to the U.S. Capitol to attend a protest planned for January 6, 2021, as they were the ones who saw and understood that the Election had been rigged.  They were the equivalent to the "Early Adopters" who are the first to buy products with new technologies.  Without Early Adopters buying products with new technologies, they would not succeed, and likewise, without the protestors who were early in accepting the truth of the rigged Election, the general public's opposition to the election rigging could not succeed.  The psy-op was genius.

75.      Long before January 6th, in fact, going back at least to September of 2020, active participants in what has been called the "Deep State" with various Non-Government Organizations

18

("NGO"), including Globalists, Patrick Young, Lisa Fithian, Maria Stephan, and Erica Chenoweth, along with hundreds of others actually knew January 6th was the date that the votes of the Electoral College would be counted and that Biden would be named as the winner of the election at the Capitol that day.  These traitors conducted Zoom meetings to plan how the Globalists' were to turn a peaceful protest of the conservative J6ers into the peaceful events into the appearance of a riot.

76.    Those seditionists, insurrectionists, and traitors, as early as August or September of 2020, long before the Election, itself, actually plotted to break some of the windows of the Capitol Building so that their compatriots and foreign participants would enter the Capitol Building to unlock and open the doors of the Capitol so that the anticipated protestors outside would be herded into the Capitol Building.

77.    The plan was a trap to identify and destroy the tip of the spear of opposition to the election rigging.  It was a psy-op designed to stifle public outcry of the rigging of the Election, itself.

78.    Others were involved, such as Nancy Pelosi, who as Speaker of the House of Representatives was responsible for the safety of the membership.  When offered 10,000 National Guard, she rejected any help.  She later admitted her responsibility.

79.    These Globalists borrowed from the gamebook of Adolf Hitler, who, 28 days after he was appointed Chancellor of Germany on January 30, 1933, had his storm-troopers burn down the equivalent of Germany's capitol structure, the Reichstag.  By doing so, he was able to take absolute power and became the Fuhrer within 60 days of his appointment of Chancellor.

***The Rigging of the Election Had Been Obvious to the J6ers***

80.    After the Election, the Americans who supported Donald J. Trump could see that the Election had been rigged.  To them it was obvious as no state in the country had ever stopped

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

the counting of ballots after the counting began.  Then, on election night of 2020.  In 4 swing states in which Trump was ahead, the counting stopped (supposedly by coincidence), and in the morning, when the counting re-commenced, Biden was in the lead in each state, with a staggering percentage of the votes which came in after the counting was suspended.  For instance, in Michigan, after the polls closed, instantaneously, Donald Trump received 5,968 votes while in that fraction of a second, Joe Biden received 141,258 votes.

81.    In Arizona, 22,093 mail in ballots were received the day before they were supposedly mailed.

82.    In Fulton County, Georgia, the J6ers saw the video from the camera which had been mounted on the ceiling of the ballot counting room.

83.    In Pennsylvania, the commonwealth mailed out 1,823,148 ballots and received 1,462,302 back.  Yet, it counted 2,589,242 mail in ballots, which were approximately 4:1 in favor of Joe Biden.

84.    There is actually a wealth of evidence, at this point, but the point is that very early after the Election, people who favored Donald J. Trump began to file lawsuits, but they lacked standing.  Approximately 60 lawsuits were dismissed without any judge examining any evidence.

***The Untoward Events Including Breaking of the Windows of the Capitol
All were a Great Success for the Globalists and Foreign Interests***

85.    All went according to plan.  President Trump encouraged protestors to go to the Capitol.  The trap was set in what would prove to be the greatest and largest conspiracy in the history of the United States.

86.    Many American patriots, including the J6ers are citizens of different states who traveled to Washington, D.C. on or before January 6th in general support of President Donald

20

Trump.[1]

87.     At their own expense, they each traveled to Washington, D.C. and found accommodation, so that they could attended speeches and rallies and gather at the U.S. Capitol to attend additional speeches and to assemble, pray, sing, learn, and protest their grievance of witnessing what seemed to be the demise of our country.

88.     With all of the trappings in place, the plans for January 6th were successful. The J6ers were cajoled, directed, and forced by GS gas and other insults to their bodies to enter the Capitol Building.

89.     Many other incidents occurred, including the beating to death of Roseanne Boyland, the deaths of 2 J6ers as a result of concussion grenades being launched at them, and the horrendous death of Ashley Babbitt.

90.     The circumstances of her death appear to have been pursuant to another more specific plan to make the "riot" there was a need for horrible things to occur. The film director and photographer John Sullivan just happened to be present with his crew to film the shooting, where supposed SWAT team members were present and who then apparently changed their clothing after their parts in the performance were concluded.

91.     The 274 FBI who were present in the crowds were successful in keeping hidden as to their true identity, and they succeeded in moving the crowds forward and into the Capitol Building, where they became susceptible to be charged with misdemeanors and potentially felony charges, as they later were.

---

[1] Note that motivations varied widely, and some plaintiffs were motivated more by a need to raise awareness regarding various issues including public health overreach and/or election integrity generally.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

92.    The psy-op worked like a charm where the American people, including the judges in the D.C. federal courts were outraged by the conduct which they understood to have been started by the J6ers.

*Pipe Bomb Fairy Tale,*
*A "Gallows" Constructed with Government Permission, and*
*A Scaffold Commander Urging Protestors to Move Forward.*

93.    Upon arrival at the Capitol on January 6th, the J6ers found themselves in a confusing setting, with no signs regarding scheduled events and few visible law enforcement officers.  A cheaply constructed "gallows" with a hanging noose had been erected by never-identified persons with apparent government permission.[2]

94.    Although there were sections of minor fencing erected on the grounds early on J6, that fencing was mostly removed by afternoon, and the vast majority of the J6ers freely strode upon the Capitol Grounds without any obstructions or indications that they were not permitted to go there.

95.    Capitol police officials in league with the general conspiracy to harm the protestors, later falsely testified at trials, at the direction of the Garland DOJ that the Capitol was ensconced in near-fortress-like security.

96.    Within minutes of the beginning of Congress' scheduled electorate voting proceedings, government officials announced that "pipe-bombs" had been found at nearby Republican and Democratic-National Committee headquarters.  It was the supposed finding of "pipe bombs," and not any conduct by any J6ers, that first caused proceedings at the Capitol to

---

[2] Note that the gallows qualified as an installation and required a permit for placement on the Capitol Mall.  The installation took more than an hour to set up, during morning hours before large crowds arrived.

22

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

pause.[3]  The story of pipe-bombs was constantly changing[4] and involved agents of the Capitol Police, President-Elect Kamala Harris, and the Secret Service.  The pipe-bomb announcement triggered evacuations, closures, and shelter-in-place orders which ultimately culminated in a six-hour delay of Congress.  All of this was later wrongfully blamed on the J6ers.

***The Afternoon Unfolded According to Plan***

97.    Not only did the seditionists, insurrectionists, and traitors in the Deep State and certain NGOs plan to break the windows of the Capitol Building, to have agents go into the Capitol through the broken windows, and to open the doors of the Capitol so that protestors who would be on the Capitol grounds could be directed into the Capitol building, but the FBI infiltrated the crowds which surrounded the Capitol with a united plan to move the crowds forward and ultimately into the Capitol Building.  They had 274 agents and others under their control in place to accomplish this.[5]

---

[3] From another J6er's statement of facts:

> At around 1:30 p.m.  EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters. *United States v. Tommy Allan*, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 4.

[4] Christopher Wray's FBI fabricated or doctored video and released fabricated slowed-down, deliberately-grainy footage of the "pipe bomber" to the public so as to prevent 'solving the crime' (while Wray's FBI purportedly offering a large reward for the supposedly-elusive 'bomber').  The "pipe bombs" themselves resembled stock dummy devices with less-than-one-hour kitchen timers.  Private journalists later showed that Capitol Police bomb squad members knew precisely where to look for the "bombs"—obviously having foreknowledge.  The FBI is known to have made several phone calls to The Blaze Media seeking to stop The Blaze' reporters from continuing their investigation.

[5] In furtherance of their plan, the FBI keep the fact that they had 274 agents and confidential informants at the Capitol until September of 2025.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

98.     Then, around 1:00 pm on January 6th, many the Plaintiffs witnessed undercover FBI agents and Cis, etc. shouting to "Go! Go! Go!" commanding and directing the crowds to move forward, toward the Capitol Building.  One instigator nicknamed the "scaffold commander" positioned himself on a scaffold tower with a megaphone, shouting at the thousands of protestors to move closer and enter the Capitol.  Another never-identified instigator, wearing a red "MAGA" cap with a price tag still affixed, broke and smashed the first window of the Capitol on the West side, to allow infiltrators to climb through the windows.  That was according to the plan of the seditionists, insurrectionists, and traitors who rigged the 2020 Presidential Election and then participated in and planned the events of January 6th, as a psy-op to dissuade organized challenges to the rigged election.

99.     The identity of the instigators has been well known to Wray's FBI for years; and those instigators have been under Wray's and Garland's protection.[6]  Also, the paucity of law enforcement security on January 6th was deliberate.

100.    As events unfolded on the Capitol's west side, Capitol police officers on the *east* side engaged in trickery with crowds of protestors, promising crowds (sometimes over megaphones) that police would try to help protestors approach more closely to the Capitol doors.  When J6ers saw barriers removed on the east plaza, the protestors rushed forward, thinking officers

---

[6]     Another similar example involves a mysterious man wearing a gas mask who pushed J6er Will Pope into the Capitol at the east side's carriage doors.  Just as with Scaffold Commander, MAGA-hat guy and the pipe bomber, Garland's DOJ prosecutors claimed they possessed no information about the man who pushed Pope inside the building (making Pope the first J6er to breach the east side).  But after three years and much diligent research by Pope, DOJ admitted that the gas-mask wearing individual was known to the government and that the individual possessed a federal security clearance.  See    https://x.com/FreeStateWill/status/2006853257902305719 (accessed 1/2/2025).

24

had approved their advancement to the steps of the Capitol. Notwithstanding the obvious entrapment, the Plaintiffs were later charged with crimes for doing so.

101. When Capitol Police on the Capitol's west side repeatedly used force and possibly lethal force[7] on the J6ers, the festive or pensive milieu quickly changed. Metropolitan Police bombarded the crowds of peaceful protestors who had been praying and singing songs like *God Bless America* were suddenly hit with percussion grenades, teargas, and rubber bullets, notwithstanding that they did nothing to provoke such an attack. Moreover, the Capitol Police caused bloody injuries to J6ers which further enraged the crowd and led to an escalation of violence in reaction and in self-defense.

102. During the events of that day, federal law-enforcement officers, including but not limited to officers of the Municipal Police Force and other federal agents, deployed chemical irritants (including pepper spray and tear gas), batons, flash-bang devices, and other less-lethal munitions against the Plaintiffs and the crowd without justification and in a manner that was excessive, unreasonable, and in violation of the Plaintiffs' rights.

103. Worse, at approximately 2:24 pm, the Metropolitan Police were low or out of their teargas and percussion grenades. They were down to a box of CS Gas canisters. CS Gas is so horrific in its effects, that it is a crime to use it in war. It causes severe inability to breathe, panic, high anxiety, and raw anger. A Metropolitan Police officer aimed a shot of a CS Gas cannister at scaffolding on which some J6ers had climbed, but the wind caught the cannister and took it to a line of Capitol Police, causing that line to break. Then the rest of the supply of CS Gas was shot

---

[7] Capitol and Metro police officers, including Shauni Kerkhoff and Anthony Campanele, used "less than lethal" weaponry such as pepper ball guns in a manner that was lethal under the law, rules and training.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

into the crowds of protestors.

104.    As a direct and proximate result of unlawful use of force, the Plaintiffs suffered injuries including chemical burns to eyes and respiratory systems, contusions, lacerations, and exacerbation of pre-existing conditions.

### *The Largest General Search Warrants in American History*

105.    Soon after January 6th, Attorney General Garland, U.S. Attorney Graves, and FBI Director Wray, in furtherance to the conspiracy to cause the protestors grave harm, and if furtherance of unseating the government of the United States with Donald J. Trump, President, violated Fourth Amendment limitations in their investigations of J6ers.  These acts were all acts of sedition, insurrection, and treason.  These federal officers crafted and used the largest and most general search warrants in history to identify every cell phone at the U.S.  Capitol on January 6th.  The warrants were so general that they didn't even try to state suspicion that any individual committed any specific crime, as the U.S. Constitution requires.  Rather, the warrants simply listed a menu of ten-to-twelve possible crimes (including crimes which never occurred such as murder) and alleged that possessors of cell phones were either perpetrators or witnesses of such crimes.  These federal officers used these unlawful search warrants to find and identify the Plaintiffs, despite having no probable cause at the time of the issuance of the warrants.

### *Government-Funded Vigilante Stalkers*

106.    Wray's FBI also funded and provided illegal material support to a private vigilante group, "the Sedition Hunters," who worked to identify and investigate J6ers by both legal and illegal means.  Among other things, Wray's FBI violated court orders by providing Sedition Hunters with court-protected discovery.  J6ers such as Lyons and Williams, were identified by this secretly-government-funded vigilante group.  J6er Allan, was stalked by Sedition Hunters who

26

repeatedly tried to get Allan fired from his job. J6er Abual-Ragheb, was also stalked and harassed by Sedition Hunters, as were some of the Plaintiffs in this Complaint.

107.    In support of the conspiracy to harm the J6ers, the FBI hid its support for Sedition Hunters for years, until after all J6er prosecutions ended and it was too late for J6ers to challenge illegal searches, stalking and harassment.[8]

***Savage, Militarized, Pre-Dawn SWAT-Style Tactical Arrests***
***Over Misdemeanors, Even for Those Whose Lawyers***
***Said They Would Self-Surrender.***

108.    In most ways the J6 protest demonstrations were similar to hundreds of other rallies and protests at the Capitol over generations.    Under well-settled state and federal law, demonstrators at capitols and legislative assemblies were to be allowed to speak freely and be given avenues for expressing and demanding redress.[9]  Even if accused of trespassing or other misdemeanors, protestors must be given multiple warnings and opportunities to depart or comply with commands.[10]

---

[8] See Ken Silva, "Online Sleuths who Hunted J6ers were FBI Informants," Headline USA, Jan. 21, 2026,    https://headlineusa.com/online-sleuths-who-hunted-j6ers-were-fbi-informants-new-docs-reveal/

[9] See D.C. Law, Ch. 3A § 5–331.03. Policy on First Amendment assemblies. "It is the declared public policy of the District of Columbia that: (1) Persons and groups have a right to organize and participate in peaceful First Amendment assemblies . . . and to engage in First Amendment assembly near the object of their protest so they may be seen and heard. . ." (2) "MPD shall not engage in mass arrests of groups that include First Amendment assemblies or that began as a First Amendment assembly unless MPD: . . .
(B) Has issued an order to disperse . . ." See also ACLU, Demonstrating in D.C.: Know Your Rights (2025); Metropolitan Police Department, First Amendment Demonstrations (2021).

[10] *See, e.g., Adderley v. Florida*, 385 U.S. 39 (1966) (upholding trespassing convictions for student protestors at a jail; but unanimously stating that such protesting at a legislative capitol would be a defense to trespassing charges); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (ruling that the First Amendment forbade state government officials to force a crowd to disperse when they are otherwise legally marching in front of a state capitol).

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

109.    FBI Director Christopher Wray, and Attorney General Merrik Garland, directed that FBI agents be diverted from serious, violent and sexual crime investigations to focus on misdemeanor January 6th investigations.[11]  In many cases, J6ers were subjected to early morning paramilitary arrest-raids despite previously contacting FBI through attorneys to arrange peaceful meetings or surrenders.

110.    Prior to January 6th, most FBI agents had never arrested anyone for misdemeanors (as such offenses are generally initiated by citations).  However, in furtherance to the conspiracy to commit insurrection and sedition, Wray and Garland implemented the "shock and awe" program.  They directed that armored FBI, and paramilitary SWAT-style tactical teams with military equipment descend on the homes of J6ers who were accused of being misdemeanants. Wray and Garland directed that the raids be conducted in a terrifying manner, with explosives and battering rams and teams of agents displaying masks, helmets, body armor, and semi-auto and automatic rifles.[12]

111.    Wray's agents smashed and tore off the Plaintiffs' doors and gates, using flashbang grenades to traumatize the Plaintiffs.  Wray's agents also commanded that local police assisting in the terror raids turn off their body cameras, often in direct violation of local police policies.  That was done so that there would be no evidence of how they treated the J6ers.

***Overzealous Prosecution As "National Security"***

112.    Garland, Graves, Wray and the other federal officials gave countless public

---

[11] Note that such staffing decisions are administrative, rather than prosecutorial, decisions.

[12] Upon information and belief, no accused J6er (out of more than 1,500) offered any violent resistance or obstruction during these arrests and abusive raids.

28

statements describing the J6 demonstration in the course of their employment and accused the J6ers of attacking the Capitol, Congress, and even democracy, itself.[13]  Those officials peppered their pleadings, complaints and arguments with national security justifications and false defamatory language.[14]  In accordance with this "national security" artifice, these officials spent the next four years feverishly preventing J6ers from arguing or even invoking the protections of the 1st Amendment.

113.    Each J6 criminal prosecution began with government motions for protective orders, based on fake 'national security' grounds.  The motions prevented J6ers and even judges from discovering the DOJ's concealed deceptions and fabrications, and it prevented the public from assisting J6ers.  The DOJ falsely proclaimed that the locations of overhead cameras at the Capitol (which millions of people had seen while touring the Capitol) were so top secret that "national security" would be jeopardized if J6ers were able to share surveillance camera footage with the public.

114.    The United States designated much of the discovery "sensitive" so that J6ers could only view it in the presence of their attorneys.  This prevented many J6ers from putting on a defense because they lived at great distances from their attorneys.

115.    The officials' true reason for demanding the protective orders was to keep the public

---

[13] Confirmation hearing, January 2021.

When nominated, Mayorkas said if confirmed, he would do "everything I can" so that such an assault on the legislative branch and symbols of democracy would not happen again.

[14]  See Luke Barr and Alexander Mallin, "AG Garland testifies Jan.  6 insurrection was 'most dangerous threat to our democracy," *ABC News*, May 12, 2021 ("Attorney General Merrick Garland told the Senate Appropriations Committee on Wednesday that he has not seen a more dangerous threat to democracy than the "invasion" of the Capitol on J6, which he called in written testimony a "heinous attack" and "intolerable assault.")

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

from being able to identify undercover operators in the J6 crowds; which would have revealed the true scope of government entrapment and government distortion.)

***The "Capitol Siege" Section and The Application of Military Language And Techniques to J6 Investigations.***

116.    The United States named the DOJ unit prosecuting the J6ers the "Capitol Siege Section," using terminology rooted in military strategy with no criminal-law meaning.[15]  They established a website for the "Siege" section.[16]  That unit, which was operating to support the sedition, insurrection, and treason against the President of the United States, ironically loaded its charging documents with military language, ironically referring to the J6ers as the "insurrectionists" and focused on "breaches" of "perimeters," and "storming" the Capitol.  DOJ pleadings constantly referred to the demonstration as "the attack" on the Capitol.

117.    Pursuant to their plan against the government of the United States, Graves, Garland, and other federal officials turned J6 prosecutions into acts of partisan warfare.  They invited DOJ lawyers who politically opposed Trump and MAGA conservatives to relocate to D.C. and "join this mission" because they "believed in the defense of democracy."[17]  Those prosecutors viewed their investigations, not as justice inquiries into crimes, but as a "criminal inquiry into efforts to stop the peaceful transfer of power."[18]  They were used by the true seditionists, insurrectionists,

---

[15] A siege refers to a military operation in which armed forces surround a place, usually a fortified city or stronghold, with the goal of cutting off essential supplies and forcing the enemy to surrender.

[16] https://www.justice.gov/usao-dc/capitol-breach-investigation-resource-page (now defunct).

[17] Ryan J. Reilly, "Jan 6 prosecutors describe 'shocking' 'gutteral' week after Trump's pardons," NBC News, Jan. 24, 2025, https://www.nbcnews.com/politics/justice-department/jan-6-prosecutors-describe-shocking-guttural-week-trumps-pardons-rcna188970 (accessed 10/1/2025).

[18] Ryan J.  Reilly, "As Jan 6 probe expands, officials worry DOJ resources are at a breaking point," NBC News, July 29, 2022,

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and traitors who rigged the election and then assisted in squelching any accountability in their effort to take over America.

***Involvement of the "National Security Division"[19]:***

118.    Garland, Graves, and the other DOJ officials collaborated with the "National Security Division's Counterterrorism Section on many J6 prosecutions, treating the cases as counterterrorism efforts.[20]   Garland, Graves, and other officials explicitly proclaimed that J6 verdicts were obtained through the "National Security Division's Counterterrorism Section."[21]  J6 convictions were described as "*battlefield victories*."  DOJ spokesmen proclaimed that the DOJ was bringing "accountability to [J6ers] who attacked our democracy on January 6."  The United States' use of the Joint Terrorism Task Force invoked national security weaponry over matters that had nothing to do with terrorism.

---

https://www.nbcnews.com/politics/justice-department/jan-6-probe-expands-officials-worry-doj-resources-are-breaking-point-rcna40208 (accessed 10/1/2025).

[19] Note that the DOJ's "National Security Division" has a stated mission which strays markedly from a pure prosecutorial mission: "The mission of the National Security Division is to protect the United States from threats to our national security by pursuing justice through the law.  The NSD's organizational structure is designed to ensure greater coordination and unity of purpose between prosecutors and law enforcement agencies, on the one hand, and intelligence attorneys and the Intelligence Community, on the other, thus strengthening the effectiveness of the federal government's national security efforts."

[20] For example, in a January 6, 2025, press release on the San Diego U.S. Attorney's Office's role, GARLAND's DOJ stated: "These cases are being prosecuted through a collaboration led by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

[21] For example, GARLAND's November 7, 2023 press statement that "This case is being prosecuted by the U.S. Attorney's Office for the District of Columbia and the Department of Justice National Security Division's Counterterrorism Section."

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

*Selective Targeting and Prosecution of J6ers*

119.    Over the years, similar or even greater intrusions by demonstrators at the Capitol had been punished with $25 or $50 fines, even for protestors who forcefully occupied Capitol spaces and refused and resisted orders to leave or remove them.  However, the officials in this case selectively prosecuted the Plaintiffs herein with unique charges never applied in similar circumstances, vindictively escalated to life-crushing felonies for the vast majority who insisted on trials.

120.    Similarly situated individuals, those who engaged in violence, property destruction, or disruption of government functions during 2020 protests, were not prosecuted with comparable vigor or at all.  That selective enforcement was based on the Plaintiffs' political viewpoints and was orchestrated at the highest levels of the DOJ and FBI who participated in the sedition, the insurrection, and the treason to take over the United States.

121.    Even past demonstrators who had disrupted the precise, identical proceedings,[22] on prior January 6th dates had been given $50 fines.



---

[22] See Zoe Tillman, "Protesters Arrested As Congress Certifies Trump's Victory," Buzzfeed News, January 6, 2017 https://www.buzzfeednews.com/article/zoetillman/protesters-arrested-as-congress-certifies-trumps-victory (accessed 1/10/2026) (saying protestors Renaldo Pearson, Tania Maduro, and Ryan Clayton "were each charged with one count of disruption of Congress, a misdemeanor that carries a maximum penalty of six months in jail." "The protesters were released Friday evening after posting and then forfeiting $50, a process under District of Columbia law available for certain low-level misdemeanors that resolves the charges.")

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

*Figure l. Three protestors arrested on Jan. 6, 2017 got $50 fines for disrupting the identical certification ceremony. There were no claims of Secret-Service "restricted areas" for such demonstrators, despite the presence of VP Biden.*

122.    There were even demonstrators who committed the <u>precise, identical conduct</u> of picketing or parading at the Capitol alongside and surrounded by J6ers, who never feared arrest because they were <u>anti-Trump, pro-Biden</u> protestors. For example, a pro-government extremist demonstrator named Patricia Eguino was never arrested by the Biden DOJ because she was a Democrat, despite Ms. Eguino brazenly holding political pickets on January 6, 2021, on the upper east terrace of the Capitol.



*Figure 1Democrat, anti-Trump protestor Patricia Eguino taunting J6ers with a political banner. Those around Ms. Eguino were prosecuted; Ms. Eguino was not.*

123.    Even demonstrators at the Capitol who forcefully or violently disrupted official proceedings in years past were given $50 fines, if prosecuted at all. Several notorious pro-Democrat protestors have been detained many times each for obstructing congressional proceedings, but were never prosecuted for 20-year felonies

124.    The officials herein turned a routine Capitol protest and 6-hour delay[23] of Congress

---

[23]    Note that other protests at the Capitol have shut down Congress for much longer periods. For example, the Kavanagh confirmation protests in 2018 stopped and disrupted proceedings for days. The May Day protests of 1970 also disrupted Congress for days. The Bonus Army occupation of the 1930 shut down congressional proceedings for many days.

33

into the largest and most expensive investigation in American history, with an overarching aim of chilling and suppressing the expression of particular viewpoints and grievances.  The officials fabricated evidence, concealed and withheld exculpatory evidence, made knowingly false statements in affidavits, pleadings,[24] and official proceedings related to the Plaintiffs' prosecutions, and exaggerated, concocted and manufactured threats and injuries, to secure wrongful charges, convictions and sentencings.

125.    Note that the systematic targeting of a class of people due to affiliation with a politically unpopular or ousted ideology is administrative rather than prosecutorial conduct.  *Reno v. AADC*, 525 U.S. 471 (1999).  The participation of silencing dissent of the rigging of the Election was a carrying out of the aims of the conspiracy to commit sedition, insurrection, and treason by all involved.

126.    Moreover, the conspiracy was committed by learned judges who were onboard to make sure that the sentences for J6ers were by far the harshest in U.S. history for political protesting, rioting, or demonstrating of any kind.  Indeed, the longest prison sentences for J6ers were many times longer than those for any comparably-situated political demonstrator or rioter in history, and the 1st, 2nd, and 3rd highest individual misdemeanor fines in U.S. history were all

---

[24] The Statement of Facts presented by the government in Tommy Allan's case is illustrative: "Many of the federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. . .  At least one of the subjects carried a handgun with an extended magazine." Each of these statements is false.  The most serious injury to any officer was a broken finger.  The most common injury was "pain." No officers died as a result of injuries from J6. No member of Congress was ever in the same room as any demonstrator.  No J6er was ever accused of entering the Capitol with a firearm. *United States v. Tommy Allan*, Case 1:21-cr-00064-CKK Document 1-1 Filed 01/20/21 Page 5-6 (emphasis added).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

imposed on J6ers.[25]    Perhaps, some judges should be investigated and prosecuted for their horrendous conduct.  No recommendation as to judges is being made, but treason is treason, and donning black robes should not protect anyone from being charged with treason if it is a crime committed.

127.    Wray's FBI illegally placed J6ers on Terrorist Watch Lists and "SSSS" flight restrictions which subjected them to extra security measures during air travel, including strip searches.

128.    The United States de-banked and facilitated the debanking of J6ers so that J6ers were denied access to credit institutions.  The United States also secretly directed and facilitated the deplatforming of J6ers from social media.

129.    Acts such as spreading disinformation, imposing a program of shock-and-awe[26] pre-dawn paramilitary SWAT-style raids to terrify and traumatize arrestees (causing numerous suicides, attempted suicides and miscarriages), setting up a snitch line to maximize arrests and

---

[25] J6er Rebecca Lavrenz now holds the all-time record with a $103,000 fine.  The second heaviest fine in history for a misdemeanor was levied on another J6er, Brady Knowlton ($75,000).  Third place seems to be a tie with criminal defendant named Robert J.  Brenna Jr.  (New York) who paid a $25,000 fine in 2003 for violating the Clean Water Act (the highest until January 6.  J6er Paul Johnson's $25,000 fine apparently tied Brenna's 2003 fine for third place.)

[26]  See Scott Pelley, "Inside the prosecution of the Capitol rioters," 60 Minutes, March 22, 2021 https://www.cbsnews.com/news/capitol-riot-investigation-sedition-charges-60-minutes-2021-03-21/  (accessed 5/19/2025) (Acting US Atty Michael Sherwin explained that "our office wanted to ensure that there was shock and awe ….  And it worked because we saw through media posts that people were afraid to come back to D.C. because they're like, "If we go there, we're gonna get charged."; Jonathan Turley, "How Prosecutors Turned January 6 Rioters into Rioters," *New York Post*, Jan. 20, 2025,  https://nypost.com/2025/01/20/opinion/how-prosecutors-turned-january-6-rioters-into-martyrs/  (accessed 5/18/2025) ("The Justice Department set out to send a chilling message to the nation.  In an interview with CBS News a year later, Justice Department official Michael Sherwin indicated that they wanted to send a message with the harsh treatment of defendants.").

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

social division, staging  deployments of explosives against accused misdemeanants,[27] certifying the world's most expansive general search warrants in history without probable cause,[28] materially supporting private vigilante groups to hunt down suspected J6 demonstrators, throwing out settled pretrial detention standards to keep nonviolent J6ers behind bars without convictions,[29] placing Americans on watch lists, facilitating the de-banking of U.S. citizens, concealing and withholding the role and numbers of undercover government operatives and informants among demonstrators on January 6th, applying constrained 20-year-prison "obstruction-of-official-proceeding" charges to political demonstrators, punishing J6ers who refuse to plead guilty with retaliatory charges commanding 40-times-greater sentences, and threatening or arresting defense witnesses to prevent the J6ers from defending themselves are administrative, "national security," and investigatory conduct; not prosecutorial advocacy.

---

[27] *See Burns v. Reed*, 500 U.S. 478 (1991) (prosecutors do not have absolute immunity when giving legal advice to police regarding investigative stages of case, as such conduct is more administrative/investigative).

[28] *See Kalina v. Fletcher*, 522 U.S. 118 (1997) (certifying facts in an affidavit for probable cause was not entitled to absolute immunity—only qualified).

[29] In February 2021, the DOJ worked with Chief Judge Beryl Howell to create guidance for whether J6ers should be granted pretrial release.  The "Chrestman 6" (or "Chrestman factors").  *United States v. Chrestman* (Case No. 21-mj-218).  Howell granted the government's motion for review of a magistrate's pretrial release order, stayed the release, and ultimately ordered pretrial detention. The six factors were (1) felony or misdemeanor, (2) "the extent of the defendant's prior planning," (3) whether the defendant used or carried a weapon, (4) evidence of coordination with other protesters (5) whether the defendant played a leadership role, and (6) the defendant's words and movements during the riot.  This framework helped keep nonviolent J6ers in jail indefinitely; J6ers needed to pled guilty or be held through trial.  It was the first time an entire category of defendants were subject to special bail rules that didn't apply to others.  And the *Chrestman* factors added factors for pretrial release beyond what the Bail Reform Act required.  And the Bail Reform Act, 8 U.S.C. § 3142, enacted during the tough-on-crime Reagan presidency, was itself controversial for expanding pretrial detention.  *See United States v. Salerno*, 481 U.S. 739 (1987).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

*Prosecutors*

130.    Acting U.S. Attorney for D.C., Michael R. Sherwin, was responsible for organizing his Assistant U.S. Attorneys ("AUSAs") and pursuant to the plan to take over the United States, attempted to blame President Donald J. Trump for sedition, when he, himself, ironically, was actually the one who was guilty of the claim.

131.    John Crabb Jr. was the Chief of the Criminal Division of the Office of the U.S. Attorney in D.C. and was the direct supervisor of Thomas Windom on the January 6th Detail.  J.P. Cooney acted as Deputy Special Counsel to Jack Smith.  These two commenced investigations against President Trump and "individuals within his orbit" regarding the leadup to J6, in their attempt to accuse Donald Trump of insurrection, and offered false testimony to the J6 Select Committee.  One of the worst conspirators who conspired with Jack Smith as his deputy, was Molly Gaston, who took pride in announcing that a grand jury had returned a true bill in August of 2023 against President Donald J. Trump.

132.    Gregory Rosen was the Chief of the Capitol Siege Section, Breach and Assault Unit in the office of the U.S. Attorney for D.C.  It was his office working in conjunction with the above-named conspirators.  He worked together with Prosecutors Carlos Valdivia and Samuel White who, in a *Taranto* sentencing memorandum which they field, they described J6 as "a mob of rioters," consistent with the needs of the seditionists, insurrectionists, and traitors to the United States.  Their work was part and parcel of the destruction of the tip of the spear of objections to the election which had been rigged.

**Judges Joined the Prosecutors in Subjecting J6ers to Unprecedented Treatment.**

133.    The most disappointing aspects of the takeover of the United States by foreign forces and Left Wing/Globalist extremists were the way that the vast majority, but not all, of the

37

District Court Judges and Magistrate Court Judges were united between themselves in the District of Columbia to destroy the lives of the J6ers. All of their actions which were done beyond the bounds of reason and were unwittingly in furtherance of the purpose of sedition, insurrection, and treason against the United States of America. This was a demonstration of how effective the Globalists were in misleading the public and the judges. It is completely understandable that a judge who saw and watched and then saw accounts of what occurred on J6 would think that the J6er on trial was evil. Unfortunately, the judges were all fooled into believing the scenario which appeared to be real, but was not.

134.    Of all of the judges, though, there was one who knew or should have known the truth, U.S. Magistrate Judge Moxila A. Upadhyaya who was one of the most extreme in her anti-J6er rhetoric and rulings. She was surely a fox in the henhouse who had her own goals and agenda. Prior to her being appointed as a Magistrate Judge, she was an attorney who represented the one who was the key to exporting election equipment and its insidious programing designed to control the results of the Election, the President of Venezuela, himself, Maduro. Maduro was her client. Her conflict of interest was not only real. It was extreme. The J6ers were 100% opposed to the one responsible for rigging the Election and that was Magistrate Judge Upadhyaya' former most important client.

135.    Not all, but almost all of the D.C. District Court judges and the Magistrate Judges willfully acted under the color of law to deprive j6ers of their rights including due process and their First Amendment rights.

136.    The judges of the D.C. District and Circuit were witnesses to the events of J6, because the U.S. Prettyman Courthouse is adjacent to the Capitol Grounds and the judges had

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

watched the events from their courthouse windows.[30]  Normally such personal observation of supposed crimes would require recusal or transfer of venue.  Nonetheless, the judges uniformly denied motions to disqualify them or to change venue.

137.    Forcing J6ers to defend themselves in D.C. meant that the proceedings were tilted in favor of the prosecution.  Polls showed that D.C. residents regarded themselves as victims of J6ers and prejudged J6ers to be guilty.  Polls also showed that D.C. residents wanted J6ers punished by life imprisonment or the death penalty.

138.    Moreover, the residents' local elected officials had all made points of singling out J6ers for abuse.  DC city officials had even held townhall lectures and park presentations against J6ers.  The DC mayor had issued parking bans and requests for businesses to shut down in advance of J6.  The DC mayor also ordered business to close early on the evening of J6. (Later, J6ers would be prosecuted under 18 U.S.C. §231 for adversely affecting commerce; and prosecutors even presented business managers as witnesses to the J6ers' supposed harm to the economy—bearing profit/loss data.)

139.    The judges of the D.C. District also agreed with prosecutors that J6ers could never offer evidence regarding the improprieties of the 2020 presidential election. This was basic exculpatory evidence regarding innocent motive. But these judges' rulings did not stop the judges themselves from pronouncing, as supposed fact and law, that the 2020 election was properly won by Joe Biden as an aggravating factor at sentencings.

---

[30] During closing arguments in the biggest J6 trial, the Proud Boys trial of December 2022-April 2023, prosecutors finished by drawing jurors' attention to the proximity of the courthouse to the action of J6. This was intended to impress upon the jurors a sense of personal fear and attachment to the facts of the case.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***The United States' Novel Theories of Law and Abuse of Statutes To
Maximize Imprisonment of Plaintiffs.***

140.     The United States, which had been taken over by foreign and domestic forces who continued the conspiracy of sedition, insurrection, and treason against the United States used novel theories of law[31] to target the Plaintiffs for false charges such as "obstruction of official proceedings" and "entering and remaining in a restricted area."

141.     While there are federal trespassing statutes which explicitly apply to the U.S. Capitol,[32] such statutes provide only a petty offense and plainly exempt mere presence in public areas where most J6ers walked and demonstrated.  For Garland and Graves to act according to their plan, they chose to use an ill-fitting Secret-Service "restricted area" statute, 18 U.S.C. §1752I(B), to maximize penalties and imprisonments of the Plaintiffs.  However, §1752 focuses on the authority of the Secret Service (SS) to create temporary restricted areas around certain

---

[31] For example, many J6ers who merely walked or stood in places were convicted of "disorderly conduct" based on a theory (the "raindrop theory") that Jan.  6 protesters shared equal guilt for rioting, like raindrops that join to create a flood.  *See, e.g., United States v.  Rivera*, 21-cr-60 (CKK), ECF No.  62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.  Only when all of the floodwaters subside is order restored to the field.").  The government also used "Seditious Conspiracy" charges against Oath Keeper and Proud Boy leaders based on a notion that U.S.  citizens protesting the outcome of an election qualified as an attempt to "overthrow" the government.

[32] 40 U.S.C.  § 5104(e) (2) Violent entry and disorderly conduct.--An individual or group of individuals may not willfully and knowingly--
(A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;
(B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;
(C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of--
(i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress;

40

federal protectees.

142.    The use of the §1752 statute required constant deception and fabrication of claims and evidence by DOJ prosecutors.  Knowing that the Secret Service had never formally "restricted" the Capitol on January 6th, and knowing that any designations or indications were insufficient, Garland and Graves' prosecutors retreated to a contrived argument that the Capitol Police had restricted the Capitol on January 6th on behalf of the Secret Service.[33]

143.    While the D.C. Circuit later upheld this artifice,[34] at trials of J6ers, prosecutors presented a preposterously large, "restricted area" concept map around a single protectee (Vice President Mike Pence) (who was as far as a half-mile or more away from most J6ers at any given time).[35]

144.    Garland and Graves' use of §1752I(B) yielded absurd results.  For despite the Garland DOJ's concocted claim that the Capitol Police were proxies for the Secret Service in "restricting" the Capitol on January 6th, the Garland DOJ simultaneously argued that the Capitol

---

[33] At J6 criminal trials, GARLAND and GRAVES (DOJ) presented nothing but a memo announcing a construction closure on the west side and a series of emails announcing the scheduled movements of V.P.  Pence as supposed evidence of the "restrictions."

[34] *United States v. Neely*, No. 23-3166 (D.C. Cir. Dec. 27, 2024) (affirming J6 the Defendant Darrell Neely's conviction under 18 U.S.C. § § 1752(a)(1) despite the fact that the restrictions had not been designated solely by the Secret Service).

[35]    Note that for a year, the first J6 indictments falsely alleged there were TWO Secret-Service protectees at the Capitol: Kamala Harris and Mike Pence.  But it was finally revealed that Kamala Harris had been at the DNC headquarters during the time and not at the Capitol.  Upon information and belief, government officials had secretly staged a false flag operation involving Kamala Harris and government-placed "pipe bombs" at the DNC.  But for reasons unknown, these government officials had canceled the scripted pipe bomb event or altered their intended storyline.  Of course, this means that for an entire year, the United States presented false statements and fabricated evidence to grand juries regarding the location of V.P.-Elect Harris.  Throughout 2022, the DOJ returned to the grand juries to obtain superseding indictments to correct this false information.  The Secret Service deleted all text messages relating to these matters so as to obscure the truth.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Police had no authority to 'unrestrict' any area of the Capitol, such as by opening doors, opening barricades, or inviting J6ers into the Capitol.

145. Certain unknown officers of the Secret Service were also part of the conspiracy to knowingly and deceptively delete all text messages relating to the matters of January 6th, to prevent the Plaintiffs and the public from knowing the truth and to assure that the evidence was not available to those charged for violations of law.

146. As a result, many innocent J6ers (including all of the Plaintiffs) were wrongly convicted through trickery as well as entrapment.

147. Thus, each J6 criminal prosecution was a collection of planned absurdities and fabrications. In J6 trials, prosecutors were also part of the conspiracy. They asserted that the mere presence of whiffs of smoke or pepper spray or sounds of alarms ringing, or even the sight of rolls of plastic fencing laying on grass nearby were proof of the mythical "restrictions."

148. There is no way that the prosecutors, under Graves' supervision, did not knowingly deceive jurors and judges by emphasizing signs which were not seen by individual J6ers, but which had been erected and then taken down hours before J6ers arrived, or were hundreds of yards away, or laying on the ground.

***They Were Out to Destroy J6ers***

149. This was all part of the plan to repress the J6ers and the other waves of concerned Americans who would have followed. The plan was to cause as much harm to all J6ers, including the Plaintiffs, as possible, to destroy their lives in every way possible. The point was that to make examples of the J6ers and blame them for being rioters and insurrectionists, they would lose all credibility and their freedom to continue to protest. This was the leading edge of stemming opposition to the rigged election. Worse, the plan worked.

42

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

150.    While the J6ers were on the grounds, Metropolitan Police used percussion grenades, rubber bullets, teargas, and ultimately CS Gas on the J6ers, and sprayed them in the face with pepper spray as they pushed them into the Capitol Building.

151.    Then, months later, instead of making peaceful arrests, where J6ers would have surrendered themselves voluntarily, even where J6ers offered through counsel to be voluntarily arrested, the conspiracy dictated to do the most harm possible by smashing in their front doors of their homes in the early morning hours and then to pull them all out of their houses sometimes in frigid weather in their underwear and then hold them at gunpoint.  Parents who had to stand were almost paralyzed for hours while their homes were ransacked as they stood watching the red dots from the laser sights of the guns and rifles on the chests of their children .

152.    The misuse of the court system was to an extent where the District Court Judges and Magistrate Judges in Washington, D.C. became either wittingly or unwittingly part of the whole conspiracy.

153.    For those who were imprisoned, in many circumstances, they were put in solitary confinement for extended periods because they were J6ers.  In many circumstances, prison populations were falsely told that the J6ers were white superlists, and prison guards were falsely advised that the J6ers were responsible for the deaths of 5 police offices.

154.    Every effort was made to destroy the lives of all J6ers possible and give them the harshest of all possible prison existences.

**_The Government's Misuse of 18 USC §1512I(2)_**

155.    Merrick Garland's Department of Justice, also maliciously utilized a felony punishable by 20 years imprisonment, "obstruction of an official proceeding" under 18 U.S.C. §1512I(2) to punish J6ers who refused to immediately plead guilty to lesser charges, among other

43

things.

156.    From January 7, 2021, to January 20, 2025, Wray, Garland and Graves maliciously prosecuted the Plaintiffs with the bogus charge, "obstruction of an official proceeding" under 18 U.S.C. §1512I, without probable cause.

157.    The statute was drafted by Congress as part of the Sarbanes-Oxley Act of 2002 following the accounting and auditing fraud revelations involving Enron and Arthur Andersen LLP.  The legislative intent of the Act was that it was supposed to apply to evidence-destruction, bribery, or witness tampering associated with corruptly influencing official proceedings, resulting in erroneous outcomes.

158.    Conspiracist Garland's prosecutors deployed the statute as an extremely punitive disorderly conduct law and a tool for compelling innocent J6ers to plead guilty to crimes they didn't commit.  Prosecutors admitted that they used the same evidence for §1512 prosecutions as they did for misdemeanor disorderly conduct prosecutions.  However, they used the threat of §1512 prosecutions to punish J6ers who defended themselves.[36]  Moreover, the chilling shockwaves of

---

[36] At least three dozen J6ers (at least 66 percent of all alleged misdemeanants who demanded trials) were charged with the bogus felony charges when they turned down misdemeanor plea offers. Tommy Frederick Allan; John D. Andries, Stephanie Baez, Richard Barnett were charged with misdemeanors; then superseded with felonies. (Sentenced to 45 mos.)  Damon Michael Beckley, James Bonet, Larry Brock, Therese Borgerding, Dominic Box, Sara Carpenter, Jennifer Cudd started with two misdemeanors, which were quickly superseded with felony charges when Cudd indicated she would defend herself.  David Davis, Derrick Evans, Simone Gold, Daniel Goodwyn, Derek Gunby, Brian Gunderson, Joseph Irwin, Leo Kelly, Deborah Lee, Larry Ligas, Kevin James Lyons, and Patrick Montgomery all had similar experiences.  Darrell Neely was initially charged with 5 misdemeanors, then superseded with felony § 231 counts after declining plea offers (ultimately acquitted at trial of the felony § 231 count.).  Michael Oliver as was charged with 4 standard misdemeanors on 12/8/21.  A year later, after rejecting a plea, Oliveras was charged with a felony §111 assault charge, ultimately sentenced to 5 years.  Nicholas Rodean was charged with misdemeanors on 01/29/21 and then indicted on March 19, 2021, with §1512 and felony destruction of property charges.  Mark Sahady was charged with misdemeanors until rejecting a plea; then his misdemeanors were superseded with a §1512 charge.  Grayson Sherrill was charged

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

these vindictive charging decisions reverberated throughout the J6er community, causing many innocent J6ers to falsely plead guilty to crimes they didn't commit.

159.    The Supreme Court recognized the United States' improper use of §1512 on June 28, 2024, striking down the application of §1512I(2) except in cases where "the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or other things used in an official proceeding." *Fischer v. United States*, 603 U.S. __ (June 28, 2024).

***Garland's DOJ Weaponized the Use of Vindictive Superseding Indictments***

---

with 4 standard misdemeanors on 04/06/21 which were then superseded on 12/15/21 with several felonies. Hatchet Speed was charged with 4 standard misdemeanors, then hit with §1512 charge after rejecting a petty misdemeanor plea offer. Christopher Spencer was charged with 4 standard misdemeanors on 02/23/21 which were superseded with a §1512 charge on 03/10/21. Yvonne St. Cyr was charged with two misdemeanors on Feb 12, 2021, offered a probation plea deal and hit with two felony §231 charges in May 2022 upon rejecting an offer. St. Cyr was convicted on all counts by jury in March of 2023 and sentenced to 30 months in prison. John Strand was charged with two misdemeanor and then with additional §1512 counts. He was offered a misdemeanor "entering and remaining" deal but rejected it. (Co-Defendant Simone Gold accepted and got 60-days). Strand got 32 months in prison. John George Todd III was charged with the four misdemeanors for two years and then, just nine days before trial after rejecting a plea offer, was charged with a 20-year-felony, 18 U.S.C. §111(b) assault causing bodily injury (officer cut his own finger inside the Capitol while tugging at Todd's tiny fiberglass flagpole). Later, prosecutors added a §1512 obstruction charge after Todd asserted privilege to testify before grand jury. Todd was ultimately sentenced to 5-year prison term. Anthony Robert Williams was charged on 3/24/21 with 4 misdemeanors; then superseded on 5/26/21 with §1512 and ultimately sentenced to 5 years imprisonment. After *Fischer* nullified Williams' conviction, DOJ vindictively superseded again with felony §231 charge on 12/18/24.

There are also a handful (e.g., Nicholas DeCarlo, Nicholas Ochs, Robbie Norwood, and Williams (above)) who briefly overturned their felony convictions (due to the Supreme Court's *Fischer* decision) and then were poised for release or retrials on misdemeanors—only to be charged with other superseding felony charges.

This list is substantially larger than the number of J6ers who were allowed to have misdemeanor trials (reported to be around 23). *See* Michael Kunzelman, "To plead or not to plead? That is the question for hundreds of Capitol riot the Defendants," *AP News*, Jan. 5, 2024, https://apnews.com/article/capitol-riot-anniversary-sentencing-data-c0a60a2ba68a70645bd5f9e5bcc45324 (accessed 10/25/2025).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

***To Punish J6ers Who Insisted on Their Constitutional Rights.***

160.    The vast majority of J6ers were initially prosecuted for misdemeanors.  However, there were only 23 misdemeanor J6 trials.  This is because (1) the vast majority (over 66%) of J6ers who insisted on misdemeanor trials <u>were denied such trials</u>.  Rather, they were charged with bogus superseding felonies, and (2), other J6ers, aware of the DOJ's insidious practice, falsely pled guilty to crimes they did not commit in order to save their lives and careers.

161.    J6 criminal defense lawyers frequently reported that their J6 clients were offered "petty" misdemeanor offers, meaning the J6ers were invited to plead guilty to offenses punishable by under 6 months' jail time.  However, when the J6ers rejected such offers, as a matter of course, they were punished with 20-year-felony charges.[37]

162.    No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered anything near a 40-to-1 ratio of vindictive charge escalation.[38]  Even twice is abusive, least 40 times!

_____

[37] *See, e.g.,* Josh Gerstein & Kyle Cheney, "Two federal prosecutors were placed on leave hours after describing Jan.  6 as an attack by 'a mob of rioters.'" *Politico*, Oct. 30, 2025, https://www.politico.com/news/2025/10/30/sentencing-memo-january-6-attack-00631013 (accessed 11/21/2025) (saying "defense attorney Carmen Hernandez said Taranto was only facing charges over the 2023 incident because he turned down an offer last year to plead guilty to misdemeanor charges related to the J6 riot.").  See also the September 2024 interview of Brian Korte on the Brian Lupo show "Inside J6 w/J6er Brian Korte," *Inside J6 with Brian Lupo*, Sept. 18, 2024 (https://rumble.com/v5fgsfp-inside-j6-w-j6er-brian-korte.html (accessed 11/24/2025) (saying J6er Brian Korte pled to 4 standard after being threatened with prosecution under §1512).

[38] Compare *North Carolina v. Pearce*, 395 U.S. 711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served  after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). *Blackledge v. Perry*, 417 U.S. 21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)(defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment); *United*

**THE TICKTIN LAW GROUP**
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

### A Machine for Generating Guilty Pleas

163.    Above all, the government's practice of steep charge escalation was a machine for generating guilty pleas, including false guilty pleas.  It wasn't long before J6ers began to pronounce that they were being railroaded into pleading guilty to crimes they did not commit, being forced to submit to avoid the threatened lengthy prison sentences.

### Misuse Of 18 U.S.C. §231 and Brady Violations
### To Conceal Economic Prosperity Brought by J6ers

164.    Prosecutors also maliciously misused the federal rioting statute, 18 U.S.C. §231, which criminalizes resistance to authorities during "civil disorders" which "affect commerce." Congress obviously contemplated that the statute would apply to typical riots with property damage, looting and arson in mind.  Yet in J6 prosecutions, Garland's Justice Department concealed and withheld evidence that J6ers had boosted the local D.C. economy, bringing profitability to the city's hotel and restaurant industries which hadn't been seen for months prior and after.

### A Systematic Program of Vindictive Prosecution

165.    Under conspirators Garland and Graves, vindictive prosecution became a science. There were 23 misdemeanor J6 trials.  However, at least 35 accused J6er misdemeanants who demanded trials were punished with felony charges instead.  This means that at least 66% were denied their constitutional right to trials.

### The Biggest Mass Brady Violation in Legal History

166.    Although prosecutors are under constitutional obligations to disclose exculpatory

---

*States v. Goodwin*, 457 U.S. 368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).

47

evidence, conspirators, Garland, Graves, and their underling prosecutors knowingly withheld the most basic exculpatory evidence from accused J6ers, including evidence that refuted central features of their false allegations; including:

a.      Evidence that the DOJ had been carefully planning the J6 event since at least August 2020[39] and had planted hundreds of undercover government operatives and agents amidst the crowds on January 6, 2021.[40]   The United States concealed the information for years.  Then FBI Director Wray, in furtherance of the conspiracy to take over America, lied and lectured congressmen for accusing the FBI of planting informants or agents inside the massive crowd of Trump supporters on January 6, 2021.  In a bold statement that directly contradicts multiple official sources, FBI Director Christopher Wray falsely testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6th.  Those lies were finally revealed in September 2025 when facts showed there were 274 undercover FBI at the scene; after hundreds of J6ers had been misled into falsely pleading guilty to crimes they did not

---

[39] See John Solomon and Steven Richards, "FBI Secretly Prepared for Disputed Election and Political Violence in 2020, Bombshell J6 Memos Show," *Just the News*, Feb 9, 2026 (saying the FBI conducted a tabletop exercise in summer 2020 that led to development of strategies like undercover informants and mass prosecutions for minor crimes that it would later use with the Jan. 6 Capitol riot).

[40] Documents were declassified on September 25, 2025, which revealed that there were some 274 undercover plainclothes FBI agents among the crowds on January 6.  This withheld evidence led criminal defendants (and defense attorneys) to falsely plead guilty or counsel J6ers to falsely plead guilty.  In furtherance of their conspiracy to rig the 2020 Presidential Election and to take over the government of the United States, Former FBI Director WRAY lied and concealed this information for years and lectured House Republicans for accusing the FBI of planting informants/operatives/agents inside the massive crowd of Trump supporters on January 6, 2021. In a bold statement that directly contradicted multiple official sources, FBI Director Christopher Wray testified before Congress in July 2023 that he "does not believe" undercover FBI agents were present at the U.S. Capitol on January 6.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

commit.

b.      Evidence showing the United States' claims of "140 officer injuries" were bogus and exaggerated, and that the most serious injury suffered by any officer on J6 was a broken finger.

c.      Evidence from pre-event and post-event meetings involved acknowledgement of exculpatory and material facts (including wrongdoing and excessive force by police which stoked J6 violence).

d.       Evidence (including the presence of hundreds of armed, *filming, recording,* plainclothes agents on J6).[41]

e.      Evidence from a team of undercover Capitol P.D. officers positioned above the west front lines, filming the action below.  These officers would go into the Capitol, and at the end of the day they filmed curfew arrests.  However, the government has not produced everything they recorded.

f.      Evidence of officers committing police brutality against J6ers on a massive scale, which would have altered the United States' public J6 narratives.[42]

---

[41] As it turns out, , hundreds of plainclothes FBI agents filmed J6 events and recorded their and others' expressions, excited utterances and present-sense impressions which would have been exculpatory for many J6ers.  Upon information and belief, these withheld recordings would have likely shown that the Capitol grounds were not as restricted as government trial testimony had claimed.  Yet these many recordings were hidden and withheld from J6 defense counsels.

[42] One notorious example involves footage of officers kidney punching a J6er over a dozen times as the J6 cried in anguish.  The officer hurt his hand.  The full footage was initially posted on http://Evidence.com.  Then on Christmas Night, Dec 25th, 2021, at 9pm, the footage was removed, and an edited version replaced it.  The video abruptly ended before the beating.  The notes by the investigator stated unambiguously that "The BWC was rattled, causing the Body Worn Camera to be shut off."
Then, a NEW video popped up, where the beating had ended, but the BodyCam footage resumed. See also https://x.com/FreeStateWill/status/1693613732633460866 (accessed 6/3/2026) (showing

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

g.    Evidence of the presence of large numbers of Antifa and Black Lives Matter rioters instigated aggressive and offensive conduct for which innocent Trump supporting J6ers were accused.

h.    Text messages and other communications by U.S. Secret Service about the events of January 6th, including "pipe bomb" claims, the movements of Trump, Pence, and Harris, and the falsity of restricted areas at the Capitol.

167.    The nondisclosed evidence that J6 prosecutions had been staged, set up, and pre-planned in advance in wargaming and tabletop exercises months in advance was also concealment that the J6 *prosecutions were a conspiracy, administratively planned, in advance rather than legitimate acts of court advocacy* in response to crimes. Not only did this withheld evidence keep J6ers from proving entrapment; but the evidence showed planning to entrap J6ers, in advance, by the United States and its officers.

168.    As a consequence of these the United States withholding this exculpatory evidence, many defense lawyers counseled J6ers to falsely plead guilty. Those J6ers who went to trial, including the Plaintiffs, became wrongly convicted of crimes they did not commit.

*DOJ's Pattern of Vindictive Escalation of Charges and Penalties*
*For the Plaintiffs Who Tried to Defend Themselves*

169.    As described above, some of the Plaintiffs, were initially charged with just misdemeanors. However, when they rejected petty-misdemeanor (i.e., up to 6 months' imprisonment) plea offers and exercised their right to trials, the Garland Justice Department

---

he second gap in McAllister's footage occurred in the tunnel as he and Lt. Bagshaw were beating the defenseless Victoria White in the head. For both gaps, McAllister's camera did not beep (as normal) when the recording resumed less than a minute later (thus showing the footage was likely edited by prosecutors after obtaining the video from officers).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

punished them with felonies in retaliation and without probable cause.  In most cases the Garland

Justice Department charged alleged misdemeanants with 20-year felonies.  This 40-to-1 ratio was

the most extreme ratio of escalation ever registered in any case in the history of federal courts.[43]

170.    Almost all J6ers who demanded trials received prison sentences.  In fact, the

majority of J6ers who were initially charged with misdemeanors found themselves facing

additional, felony, charges when they exercised their constitutional right to trials.  This occurred

amongst a jury pool composed of more than 90% Democratic voters where the jury conviction rate

for J6ers was 100 percent.  Prison sentences for J6ers who demanded trials on felonies averaged

two years longer than sentences of J6ers felons who pled guilty.

171.    This landscape of steep charge escalation and punishment led many J6ers to

denounce the prosecutions and publicly proclaim they were wrongly convicted.  In response, the

DOJ threatened further retaliation against them.

172.    Judges such as Chief Judge Beryl Howell explicitly agreed with the government's

retaliatory charging of J6ers who turned down plea offers. Chief Judge Howell even excoriated a

federal prosecutor who failed to add felony charges against a J6er who insisted on a misdemeanor

---

[43] No previous court case (including those which reversed convictions and struck down prosecutions) had ever considered a 40-to-1 ratio of vindictive charge escalation.  Compare *North Carolina v. Pearce*, 395 U.S.  711 (1969) (invalidating two convictions: Pearce, convicted of assault with intent to rape and sentenced to 12 years and then later given an 8-year term without credit for time served[43] after winning an appeal; and Rice, sentenced to 10 years for burglary but then given 25 years after winning his appeal). *Blackledge v.  Perry*, 417 U.S.  21 (1974) (finding due process violation where defendant sentenced to 6 months for misdemeanor assault was given 5-7 years for felony assault with a deadly weapon with intent to kill (over the same facts), after appealing). *Bordenkircher v.  Hayes*, 434 U.S.  357 (1978)(defendant rejected 5-year plea offer and was then indicted as career offender and sentenced to life imprisonment);[43] *United States v. Goodwin*, 457 U.S.  368 (1982) (involving an offer of petty assault (up to 1 year), which became assaulting federal officer (up to 8 years), upon rejection of the offer).

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

trial.[44]

### The Government Turned J6 Sentencing Hearings
### Into Pageants of Exaggeration, Fabrication, and Blood Lust

173.    The Government demanded seizure of every penny crowdfunded for legal defense, as punitive fines.  J6ers had difficulty finding public defenders who would zealously defend them. Moreover, in every case where J6ers sought to raise funds for their defense, the prosecutors demanded that every penny raised for legal defense be seized and turned over to the government.

### The DOJ Monitored Social Media, Seeking to Silence and Punish
### Attempts by the Plaintiffs and Their Attorneys
### To Alert the Public Regarding These Injustices.

174.    Under the Constitution, an accused has a 1st, 5th (due process) and 6th Amendment (fair trial/counsel/defense/confrontation) right to alert the public regarding injustices in the federal courts.  Accused persons also have a constitutional right to plead for help in defense.  *The public* also have 1st and 6th Amendment rights to be informed of injustices and to donate funds to fight injustice.  However, Garland's Department of Justice scoured through J6ers' social media posts to identify memes, statements, podcasts, or interviews by each J6er regarding the prosecutions. Prosecutors filed pleadings to punish those J6ers who tried to alert the public regarding their treatment.  Federal prosecutors even filed documents to sanction criminal defense lawyers who alerted the public about the unjust prosecutions.

175.    The rigging of the 2020 Presidential Election which was followed by DOJ prosecutors imprisoning J6ers and attempting to keep the wrongful arrests, fines, and

---

[44] In the case of *United States v. Todd*, Chief Judge Howell scolded a prosecutor for making her have a trial on misdemeanors.  When the federal prosecutor responded that the DOJ had searched for felony charges to bring against Mr. Todd, Chief Judge warned the prosecutor that he was "running out of time."

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

imprisonment secret from the public was in furtherance to the true insurrection which had rigged the election.

### *Fabricated Sentencing Enhancements to Increase J6er Sentences*

176.    In almost every trial where any J6er testified in his own defense (often because the J6er was forced to, because the DOJ systematically intimidated defense witnesses or precluded J6ers from presenting defense arguments unless the J6ers took the witness stand), the Government claimed the J6er lied during the testimony—invariably pointing at some *subjective* question—and then demanded a two-point sentencing enhancement for 'committing perjury.'

### *Property Returned Damaged, Broken and Missing.*

177.    Upon their release from the malicious charges, the Plaintiffs sought the return of property which had been seized by the FBI during their cases.  The FBI returned their property damaged, missing and/or broken.  The FBI returned cell phones and computers to J6ers with hard drives and files destroyed or missing.

178.    The hard drives and SIM cards were missing probably because the Government withheld, hid, or destroyed them.  Those drives and SIM cards contained images and videos taken on January 6th which refuted and debunked the Government' bogus narratives.  Thus, these acts of damage and theft constituted Brady violations as well as takings and/or negligence.

179.    All of these items were fully functional and in good condition prior to the FBI's seizures.

### *The AUSA Prosecutors Who Were Part of the Conspiracy*
### *To Commit and Cover-up the Insurrection and Treason*

180.    The following are some of the prosecutors who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

a.      Merrick Garland, the U.S. Attorney General who supervised, guided and directed the grave national injustice herein described.

b.      Matthew Graves (U.S. Attorney for D.C.), who implemented and imposed these abuses in the District of Columbia.

c.      Greg Rosen, Chief of the Capitol Siege Section who oversaw the Capitol Siege Section, supervising hundreds of abusive prosecutors and J6 investigations. He supervised more than 1,000 prosecutions, trained and managed over 200 prosecutors and staff, and coordinated the abusive investigation and litigation from grand juries through trials and appeals.

d.      Jeffrey Nestler, an Associate Deputy Attorney General at the U.S. Department of Justice, used blatant perjury in his rigged J6 trial of Oath Keepers. Mr. Nestler also concealed and withheld the evidence that would have exposed government perjury during the trial.[45]

e.      Jocelyn Ballentine supervised numerous abusive and malicious J6 prosecutions. Ms. Ballentine and Assistant US Attorney Jason McCullough approached Proud Boy leader Enrique Tarrio with a cooperation deal around October 2022 in which the government promised Mr. Tarrio's immediate release if Tarrio would falsely say that Donald Trump had directed the Proud Boys on J6.  Ms. Ballentine is presently pursuing

---

[45] Blaze Media's October 2023 investigation found that witness David Lazarus's trial testimony was contradicted by extensive Capitol CCTV footage.  Although Lazerus claimsed to witness a hostile encounter between Officer Dunn and Oath Keepers, analysis showed Lazarus was in a Senate office building when the encounter began and did not arrive at the scene until three and a half minutes after the last Oath Keepers had left the area. Officer Dunn's testimony also appears to have been inconsistent. Initially, he claimed Oath Keepers had de-escalated the situation, but his later accounts portrayed them as aggressors.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

wrongful prosecution against an innocent black man to cover up the role of the government in the government's "pipe bomb" affair.

f. Brendan Ballou, an Assistant US Attorney (AUSA) who prosecuted several J6ers with sadistic zeal. Mr. Ballou fought for jury instructions that said there were no First Amendment rights at the U.S Capitol.

g. Ashley Akers prosecuted dozens of January 6th defendants, with a focus on exaggerated claims of "assault" on law enforcement officers. She perfected the art of vindictively prosecuting accused misdemeanants with felonies when they demanded trials. She presided over the Chris Quaglin investigation, where agents told a J6er he would never see his family again unless he testified against fellow J6ers.

h. Kyle M. McWaters was a leading orchestrator of escalated 20-year-felony charges against J6ers who turned down misdemeanor plea offers. Mr. McWaters refused to dismiss a false § 1512 conviction of J6er Hatchet Speed even after the Supreme Court struck down the use of the statute as a disorderly-conduct substitute.

i. Michael Gordon, an AUSA who used his status to abuse J6ers. In at least one case Mr Gordon argued that J6ers who carried flags were committing assault with a deadly weapon because a plastic flagpole might poke someone's eye out.

j. Sean Murphy, a particularly cruel prosecutor who vindictively and relentlessly prosecuted such J6ers as Stephanie Baez with a bogus §1512 charge when Baez insisted on her right to a trial. Even after the *Fischer* decision, Mr. Murphy refused to drop the false charge against Baez. Ms. Baez was hospitalized from stress and suffered several miscarriages during the ordeal. Ms. Baez was finally acquitted of the vindictive bogus charge at trial.

55

k.     Sam White vindictively charged J6ers such as Derek Gunby with false "obstruction of official proceeding" charges when they wouldn't plead guilty to misdemeanors.

l.     Alexis Loeb, like others in the conspiracy, used her position to vindictively increase charges against J6ers who wouldn't plead guilty. As former Deputy Chief of the Capitol Siege Section, Ms. Loeb played a senior leadership role in coordinating the section's abusive and malicious prosecutions.

m.     Lisa Monaco, deputy Attorney General from April 2021 to January 2025, publicly framed January 6th as an "attack on our democracy."  Ms Monaco emphasized the heavy use of inapplicable felonies like 18 U.S.C. § 1512I(2) ("obstruction of an official proceeding") for many non-violent entrants.    Under Ms. Monaco's direction, J6 prosecutions peaked before the 2022 and 2024 elections. Ms. Monaco also tried to pressure J6er James Giannakos into falsely saying the Proud Boys had followed Donald Trump's directions on January 6th.

n.     Barry Disney vindictively and maliciously added two 20-year felony charges (§1512 and §111(b) "assaulting an officer, causing bodily injury") against a J6er when the J6er testified before the grand jury in his defense.  (The bogus "assault" charge was fabricated upon an officer's finger cut when the officer pulled on the J6er's fiberglass flagpole on J6.)

o.     Samantha Miller used Brady violations and false police testimony to obtain convictions against a J6er.

p.     Francisco Valentini stalked social media accounts of J6ers and their lawyers to punish those who criticized the unjust prosecutions.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

181.    These prosecutors overcharged many participants in the J6 protest and weaponized the Justice Department by holding defendants in pretrial detention, lengthy delays, and denying due process and exculpatory evidence to J6ers.

**The District Court Judges Who Participated**

182.    The following are some of the District Court judges who participated to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a.    Judge Beryl Howell was the chief judge of the District of DC until mid-2023. Judge Howell worked hand in hand with federal prosecutors in the escalation of misdemeanor cases into felony cases when J6ers demanded trials. Judge Howell also aided federal prosecutors in concocting diminished rights to pre-trial release for J6ers in plain contradiction of settled appellate precedent. In fact, she inserted herself to overrule all decisions from Magistrate Judges in at least 17 different courts to overrule decisions where Magistrate Judges followed the law to release J6ers who were charged with J6 offenses based on criteria of law which did not apply. This included cases involving, but not limited to Tom Ballard, Richard Barnett, Jeffrey Scott Brown, Lisa Eisenhart, Eric Munchel, Scott Fairlamb, Doug Jensen, Cody Mattice, Timothy Hale-Cusanelli, Ronald McAbee, Brian Mock, Ethan Nordean, Christopher Quaglin, Zachary Rehl, Thomas Sibick, Jack Whitton, and Christopher Worrell. Judge Howell was the main protagonist who lead the judges of the District Court of the District of Columbia, and knowingly and intentionally was intent on removing Donald J. Trump from office by concealing the rigging of the Election. Her conduct and that of the judges who follow in this section need to be examined by the Department of Justice and if applicable, they should be prosecuted for their complicity in

57

the conspiracy to commit treason.

b.      Judge Emmet Sullivan who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

c.      Judge Trevor McFadden who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

d.      Judge Rudolph Contreras who performed the same functions as did Judge Howell, including causing unwarranted reversals of releases.

e.      Judge Reggie Walton was particularly cruel in imposing supposed "COVID"-related mask and vaccine restrictions on J6ers. Judge Walton knew that prospective jurors who disdain mask and COVID vaccine rules tended to be skeptical jurors who might also be skeptical of the bogus J6 prosecutions. So Judge Walton prohibited unvaxxed jurors, in order to tilt trials in favor of the prosecution.

f.      Judge Amit P. Mehta presided over numerous J6 prosecutions and ruled for the government on most pretrial and post-trial motions. Judge Mehta also pronounced that J6er motivations were lies because the 2020 election was "clearly" not stolen.

g.      Judge Royce C. Lamberth claimed that "no evidence ever emerged" supporting Donald Trump's election criticism—despite ruling repeatedly that J6ers could never present such evidence.

h.      Judge Amy Berman Jackson referred to J6ers' election integrity motivations as "the lie that the [2020] election was stolen" despite repeatedly denying J6ers the opportunity to show their good faith regarding the issue.

i.      Judge Tanya Chutkan, who handled Trump's federal election case and many J6 sentencings, described the protest as a riot fueled by "baseless claims of a stolen

58

election" despite Judge Chutkan's denial of every attempt to support the stolen-election claims with evidence. Because the issue of "corrupt intent" was an element required for conviction under 18 U.S.C. §1512 obstruction, this denial of opportunity to present evidence was a fundamental due process violation.   Moreover, the government's withholding of such evidence was not just a discovery violation but a Brady violation.

j.      Judge Timothy Kelly helped the government conceal evidence of FBI misconduct, including evidence that Agent Nicole Miller and her team destroyed evidence, unlawfully recorded attorney/client communications and sought to break up the marriage of J6er Zachary Rehl.

k.      Judge Thomas F. Hogan made it public that the J6ers committed an "insurrection that was probably the worst thing that's happened to our democratic way of life in our history."  He continued ruthlessly with his bias.

### The Magistrate Judges Who Participated

183.    The  following are some of the Magistrate Judges who conspired to act beyond the bounds of the law, to bring injustice as the way of the U.S. District Court in the District of Columbia:

a.      Magistrate Judge Moxila A. Upadhyaya processed many J6 cases while applying the tilted rules of the other judges of the District (e.g., protective orders to prevent public awareness, pretrial rulings precluding the 1st amendment and entrapment defenses, evidentiary rulings allowing prosecutors to show evidence of violence throughout the Capitol while narrowing J6ers' evidence to things immediately seen). Magistrate Judge Upadhyaya presided over J6 cases despite having previously represented clients who were deposed or were major players in Dominion Voting machine litigation cases involving the

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

2020 presidential election.

b.      In fact, it is on information and belief that she personally represented the president of Venezuela who was the one who perpetrated the scheme of rigged election equipment on the United States.  She had been asked to disqualify herself, and she always refused.  Judge Upadhyaya had been the personal attorney for the head of the snake selling computer election results in America.  She stayed on cases knowing full well that she was deeply conflicted out and was one of the harshest and worst judges of all.  She also stays as Magistrate Judge on the matter of Dominion Machines v. Byrne, and she is so totally conflicted, it leads to a conclusion that she is aware and intentionally acting wrongfully.  Her position lead to a conclusion that she is acting in furtherance of the wrongful rigging of the Election, making her probably guilty of participating in a conspiracy to commit sedition, insurrection, and treason.

c.      Magistrate Judge Zia M. Faruqui presided over numerous J6er arraignments. At one misdemeanor J6 trial, Magistrate Judge Faruqui instructed a jury that all of the statutes involved were constitutional and that there were no First Amendment rights at the U.S. Capitol. Judge Faruqui imposed the heaviest fine in U.S. history for a misdemeanor, $103,000, upon a J6er who strode through open doors into the Capitol and walked around for under 10 minutes.

*Other Damages*

184.    As a direct and proximate result of the Government's tortious conduct, each of the Plaintiffs suffered and continues to suffer losses in excess of $1 million, including but not limited to medical expenses, lost wages and income, pain and suffering, severe emotional distress, loss of liberty, reputational harm, and other consequential damages.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

185.    The Plaintiffs also suffered loss of consortium with their spouses.  Husbands and wives abandoned them during these malicious prosecutions.

186.    At least six J6ers committed suicide due to the trauma,[46] and many others attempted suicide during the ordeal.

### The Atrocities Which Occurred In Prison

187.    When J6ers were incarcerated in jails and prisons they were subjected to additional abuse.  J6ers were forced to surrender DNA samples, even if held on mere nonviolent misdemeanors.  J6ers who refused to submit to experimental COVID-19 vaccine injections were denied attorney visits and held in solitary confinement for extended periods.  They were also denied haircuts and shaving privileges.

188.    J6ers were also denied access to their discovery to prepare for trials.  In some cases, defense attorneys who came to the jails in D.C. or Alexandria to show or provide digital discovery or video files to J6ers were turned away by jail authorities multiple times.  And in some cases, incarcerated J6ers were never allowed to see their discovery—the evidence against them—until they were in trial.

189.    J6ers were denied medical care and treatment throughout the federal prison and jail system.  J6ers such as Bart Shively and Christopher Worrell were denied cancer treatment, causing their cancers to grow out of control.  Mr. Shively died shortly after his release from prison.

190.    The FBI also monitored attorney-client communications of J6ers and used information gathered in such illicit surveillance to strengthen their prosecutions against J6ers.

---

[46]J6ers Mark Aungst, Chris Stanton, Jord Meachum, David Kennedy Homol, and Matthew Perna took their own lives during the prosecutions.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

### A Case In Point

191.    For purposes of explanation, one J6er has been chosen to explain what happened to innocent people on J6 and thereafter.  Ryan Zink was a campaign photographer for his father, a candidate for Congress.

192.    The Zinks made their way around the Capitol to the east side, following massive crowds. Shortly after 2 pm, the Zinks heard a megaphone interaction between Capitol Police officers and protestors wherein a Capitol Policeman promised to see if he could get approval for the crowd to move forward to the steps of the building.  Minutes later the barricades were removed and the Zinks saw exuberant crowds rush forward to the east Capitol steps. Ryan saw a police officer literally waving people forward.

193.    Ryan livestreamed as he and his father joined the crowd moving forward.  Ryan hyped up the drama for his livestream audience, saying into his phone, "We're storming the Capitol!"  When the Zinks got to the upper east balcony they witnessed a young man kicking at windows.  Ryan loudly shouted at the crowd to let police do their jobs and arrest the man.  Seeing that the Zinks were protecting them, the officers asked Ryan to help give them space and record the incident.  Moments later, the officers abandoned the arrest of the window kicker and moved away toward the main door.  The Zinks eventually followed after the officers to photograph and livestream the scene at the door.  When Ryan saw violence near the Capitol entrance, he and his father quickly made their way down the steps and back to their hotel.

194.    Just days later, Ryan was awakened by flash bang grenades at his home in Amarillo, Texas. A large tactical team of counterterrorism officers kicked in his door and raided his rented property.  He was charged with a 20-year felony, "obstruction of an official proceeding," and two misdemeanors.  Although a local magistrate judge ordered Ryan released on pre-trial conditions,

62

prosecutors and judges in D.C. teamed against him to appeal the ruling.

195.    Ryan spent the next month in various jails, poisoned with rotten food and losing forty pounds from illness and distress.

196.    As Ryan prepared for trial, he noticed that the DOJ deprived him of important discovery including the photos and video he had taken with his campaign camera.   The DOJ provided only his Facebook livestream images, in which Ryan had dramatized the J6 events with hyperbolic "We're storming the Capitol!" statements.

197.    At trial, the officer who thanked Ryan and asked Ryan to record the event lied on the stand and said Ryan had gotten in his way on the balcony on J6.  The officer who waved crowds forward to the Capitol testified that he was waving only at another officer.

198.    Oddly, prosecutors provided a couple images from Ryan's campaign camera in discovery.  However, prosecutors withheld hundreds of other photographs.  During trial when Zink's attorney asked Judge Boasberg to order the prosecution to provide the seized camera footage, Judge Boasberg would not issue the order, saying Zink should have asked earlier, which he had.  When Zink's counsel brought a flash drive to prosecutors for prosecutors to transfer the nondisclosed camera files, he untruthfully advised that the files had been deleted.

199.    Later, at closing argument, a federal prosecutor told jurors that Zink had lied on the witness stand about being a campaign photographer on J6 and even told the jury that the (missing) camera images did not substantiate Ryan's defense.

200.    Upon cross-examination, government witnesses admitted that no one inside the Capitol building could have possibly heard anything Ryan Zink had said to his livestream audience on his cellphone.  Jeff Zink testified that even he could not hear what Ryan was saying to his livestream audience amid the roar of the crowd. Nonetheless, Mr. Zink was convicted of

63

"obstructing an official proceeding" of Congress for making a few hyperbolic remarks into his cell phone while outside the Capitol.

201.    Prior to sentencing, the Supreme Court invalidated the use of the §1512I(2) "obstruction of an official proceeding" statute as a punishment for political demonstrators.  Thus Ryan faced sentencing for only two misdemeanors by the time of sentencing.  Nonetheless, prosecutors requested maximum, consecutive sentences for the misdemeanors.  Chief Judge Boasberg sentenced Mr. Zink to 90 days in jail, an outrageous sentence for a first-time offender who merely livestreamed his experience outside the Capitol and helped officers on J6.

202.    Ryan Zink continues to suffer long-term injuries from the ordeal and his wife suffered several miscarriages due to emotional distress.

### Specific Allegations As To Each Plaintiff

203.    In each of the Plaintiffs' cases, the J6 criminal proceedings terminated in the Plaintiffs' favor, either by dismissal with prejudice, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

204.    The prosecutions were initiated and pursued without probable cause, with actual malice, and for the improper purpose of politically persecuting the Plaintiffs because of their support for President Donald J. Trump and their exercise of constitutional rights.  The following summarizes each the Plaintiff's prosecution and its termination in their favor:

**Gina Bisignano**

205.    The Plaintiff Gina Bisignano was a successful small business owner, operating a respected hair and beauty salon in Beverly Hills, California.  As an established member of her community,  Ms. Bisignano traveled to Washington, D.C. to protest for President Trump and election integrity.  On the Capitol Grounds, Ms. Bisignano witnessed police beating and shooting

64

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

less-than-lethal munitions at innocent protesters on January 6, 2021.

206.     Ms. Bisignano subsequently engaged in typical protest behavior, urging fellow demonstrators over a megaphone to stand up and unite against government oppression and corruption.[47]  A police officer viciously struck Ms. Bisignano with a baton, causing her to suffer severe injuries to her leg, along with smoke and gas inhalation.

207.     The Defendant, United States, filed a sealed criminal complaint against Ms. Bisignano on January 16, 2021, alleging felony charges including obstruction of an official proceeding (up to 20 years in prison), and resisting authorities during a civil disorder (up to 5 years imprisonment), along with numerous misdemeanors.  Although Ms. Bisignano never damaged any property on January 6th, the United States charged her with felony "aiding and abetting" federal property destruction (up to 10 years imprisonment) because a photograph showed Ms. Bisignano standing near another individual who broke a Capitol window.

208.     Although Ms. Bisignano admitted her momentary mistakes of judgment on January 6, she experienced a truly horrific nightmare of weaponized abuse by the United States Justice Department over the following four years.  Her business, home, career, mental, social and physical health, were all destroyed.  She lost millions of dollars in savings, investment and business revenue.

209.     Ms. Bisignano was arrested on January 19, 2021, when a SWAT-type tactical team of some 40 agents raided her home at 4 a.m. Ms. Bisignano was granted pretrial release that same day in accordance with binding constitutional law and standard procedures by a U.S. Magistrate

---

[47] Among other statements allegedly shouted through her bullhorn, according to the United States' complaint, were "We the people are not going to take it anymore.  You are not going to take away our [unintelligible].  You are not going to take away our votes.  And our freedom, and I thank God for it.  This is 1776, and we the people will never give up.  We will never let our country go to the globalists.  George Soros, you can go to hell."

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Judge in the Central District of California.  Ms. Bisignano paid two hundred thousand dollars in bail and was released.  However, the United States immediately moved to override the release order, demanding that Ms. Bisignano be rearrested and brought in shackles all the way to Washington, D.C.:

> The defendant [Ms. Bisignano] was promptly presented to a Magistrate in the Central District of California (CDCA).  The government moved for detention under 18 U.S.C. § 3142(f)(1)(A).  The Magistrate denied the government's motion, ordered the defendant released on conditions, and scheduled a preliminary hearing for February 4, 2021.  The government informed the Magistrate that we intended to appeal the detention decision and asked that the release order be stayed.  The Magistrate refused.  The government promptly contacted the Chief Judge of this Court and requested an emergency stay.  The Chief Judge swiftly issued orders staying the defendant's release and directing that the U.S. Marshals Service (USMS) transport the defendant to this District forthwith for a detention hearing.
>
> The government promptly transmitted the Chief Judge's orders to CDCA, USMS, and the Pretrial Services Agency (PSA), but it was too late—the defendant was released.  The government apprised the defendant's counsel about the orders and PSA directed that she self-surrender this morning.  Through her attorney, the defendant refuses to self-surrender, contending that the stay order is moot, because she has been released, and that the forthwith transportation order is invalid because she has not waived a preliminary hearing in the district of presentment, CDCA.
>
> To preserve the government's right to appeal a Magistrate's release order and the Chief Judge of this Court's authority to review it, the government moves this Court to issue a bench warrant for the defendant's arrest and an order directing the Magistrate to stay any release order until the Chief Judge of this Court has an opportunity to review it.  Government's Motion for Bench Warrant and to Stay Any Release Order, 1/20/21.

210.    Thereafter, upon being advised that the government appealed, Ms. Bisignano turned herself in.  (She trusted and believed in the U.S. criminal justice system at that time.)  Ms. Bisignano spent the next 38 days being transported in custody, despite the United States ultimately

66

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

losing its utterly frivolous appeal.[48]

211.    Ms. Bisignano was moved from the Los Angeles County Jail by buses and the 'Con Air' plane system to Texas and then to the Grady County Prison in Oklahoma.  The Justice Department subjected her to what is known as "diesel therapy" to deprive her of the ability to assert Habeas Corpus.

212.    The United States' pattern and conduct of objecting and appealing local judicial release orders for J6ers was intentional and systematic, intended to thwart the protections of the 8th Amendment and the Bail Reform Act and to force J6ers to face rigged proceedings in the U.S. District of the District of Columbia, known by everyone to be a pro-government extremist enclave populated by hostile (to J6ers) courts and a jury pool that votes 90%-plus for Democrats in every election.

213.    In effect, Ms. Bisignano was kidnapped and held without due process.  For more than a month, Ms. Bisignano had virtually no access to a telephone.  She had to speak through toilet plumbing with another inmate.  While in custody of the United States, her home and business back home in California were ransacked, robbed and burglarized.  Her salon equipment, valued at more than $300,000, was bagged up, placed on the curb and taken away by the City.

214.    Ms. Bisignano was subjected to a second bail hearing (via Zoom) while in the Grady County Jail in Chickasha, Oklahoma.  Ms. Bisignano was released homeless and penniless in Oklahoma after the (unnecessary second) detention hearing.  Upon being returned to California she discovered losses to her business approaching a half million dollars in value.

215.    Ms. Bisignano was thereafter held on highly restrictive house arrest with an ankle

---

[48] Among the United States's stated grounds for such an unusual bench warrant was that "[u]pon the defendant's arrest, an unregistered firearm was found in her apartment."

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

monitor for <u>almost four years</u> until January 20, 2025.  During this time the United States prohibited Ms. Bisignano from communicating with other J6ers so that she was unable to locate other witnesses for her defense.  Because she was unable to work, her lucrative business died.  During that time, she had to liquidate her stocks and investments to spend to defend herself.

216.    In the midst of an emotional breakdown, Ms. Bisignano was coerced into signing a false guilty plea in 2021.  The plea agreement required that she falsely sign a statement saying she "assisted others" in breaking a window and to renounce all suspicions that the 2020 election had been stolen.

217.    On May 4, 2023, she successfully withdrew the false guilty plea.  On multiple occasions, the DOJ tried to have Ms. Bisignano jailed for such things as posting on social media, publicly exposing the injustice of her charges, or asking for support.  A single motion by the United States seeking to revoke Ms. Bisignano's release on July 28, 2024, must have taken dozens if not hundreds of man-hours wherein FBI agents or AUSAs scoured social media for Ms. Bisignano's presence.  Her case finally came to an ignominious end on January 21, 2025, when the case was dismissed with prejudice.

**William Cotton**

218.    William Cotton is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend what was advertised as a peaceful political rally. He marched to the Capitol with the crowd. As the situation became chaotic, he found himself in a tight, surging crowd where the choice was to move forward or risk being trampled. He was pushed up the steps and climbed the exterior scaffolding to escape the crush of the crowd.

219.    Flash-bang grenades began detonating around Mr. Cotton. He was maced on his way up the scaffolding. He witnessed police directing the crowd and observed that the Capitol

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

doors were open, with officers allowing people to walk through. He entered the Capitol building through open doors, as directed. Inside, he spoke with a Capitol Police officer and attempted to find a bathroom to wash the mace from his eyes. He witnessed a gunshot, immediately turned around, and exited the building. He assisted injured people outside and observed that tear gas was everywhere and many people were being hurt.

220.    Mr. Cotton was a victim of the unconstitutional geofence warrant. His location data was swept up by the government's general warrant without individualized probable cause, and this evidence was used against him in his criminal proceedings.

221.    Mr. Cotton's attorney advised him that if he did not accept a plea agreement, the government would "throw the book at him," a direct invocation of the Vindictive Prosecution Program. Faced with this threat, Mr. Cotton pleaded guilty to Count 4, Parading/Demonstrating/Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). Counts 1 through 3 were dismissed. He was sentenced to 9 months of probation. The government had requested 21 days of incarceration.

222.    As a direct and proximate result of the stress of his arrest, prosecution, and the events of January 6th, including being maced and subjected to flash-bang grenades, Mr. Cotton suffered **two strokes** and has sustained **permanent damage to the left side of his body**. These injuries are a direct and foreseeable consequence of the government's tortious conduct.

223.    The criminal proceedings against Mr. Cotton terminated in his favor through the presidential pardon issued on January 20, 2025.

**Derek Kinnison**

224.    Derek Kinnison is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally. He never entered the Capitol Building. He was

69

not at the front of the police line. He did not break anything, touch any officer, steal anything, or damage any property. He was one of a very small number of individuals who did not enter the Capitol Building but was nonetheless charged with several preposterous felony charges such as obstruction of an official proceeding, conspiracy, and "document destruction" (for erasing his own chat messages). For the most part the allegations stemmed from Mr. Kinnison's mere use of radio communications and traveling to D.C. with others.

225.    On January 6th, Mr. Kinnison was shot point blank with a flash-bang grenade at a distance of less than 15 feet, striking him square in the chest. He was not at the front of the crowd. This constituted a tortious assault and battery by Metropolitan Police officers acting within the scope of their federal employment.

226.    Mr. Kinnison was a victim of the unconstitutional geofence warrant. His location data was swept up by the government's general warrant without individualized probable cause. This evidence was not provided to him or his defense counsel, depriving him of the ability to challenge its constitutionality. The government's failure to disclose the geofence warrant constituted a Brady violation.

227.    Mr. Kinnison was a victim of Sedition Hunters. His home address was publicly doxxed, and his wife's phone number was publicly exposed. As a result, he and his family have received hate mail and harassment, including as recently as June 18, 2026. This doxxing was a foreseeable and direct consequence of the government's secret partnership with Sedition Hunters.

228.    Mr. Kinnison was also a victim of undercover government informants who were planted in his midst by the United States in order to goad, entrap, and provocateur Mr. Kinnison into committing acts that would then be used to prosecute and convict him of crimes he did not commit.

70

229.    When the FBI raided Mr. Kinnison's home, agents confiscated a cellular telephone, several thousand dollars in cash, a computer, a medical kit, tactical gear, and every knife they could find.  This seizure was conducted pursuant to a warrant that was overbroad and not supported by adequate probable cause.  The confiscated property was not returned in a timely manner or in its original condition.

230.    Mr. Kinnison possessed a valid concealed carry permit and had lawfully transported firearms, which were secured in a locked safe at his hotel.  He was not charged with any firearms violation.  However, the government introduced the existence of these lawfully possessed, lawfully stored firearms at trial for the sole purpose of inflaming the jury and prejudicing Mr. Kinnison's defense, a tactic that constituted an abuse of process.

231.    The government threatened to add a charge of Seditious Conspiracy under 18 U.S.C. § 2384 if Mr. Kinnison did not accept a plea agreement, a direct invocation of the Vindictive Prosecution Program. Seditious Conspiracy carries a maximum sentence of 20 years.  This threat was made without adequate factual or legal basis and was designed solely to coerce a guilty plea.

232.    Mr. Kinnison was wrongly convicted of crimes he did not commit and sentenced to 33 months behind bars.

233.    Mr. Kinnison was also sued civilly in *Smith v. Trump*, Case No. 1:21-cv-02265-APM (D.D.C.), by D.C. Metropolitan Police officers whom he had never met, seen, or touched. This civil lawsuit was a further instrument of harassment and retaliation against Mr. Kinnison for his political beliefs and his presence at the January 6 rally.

234.    While incarcerated, Mr. Kinnison suffered a workplace injury and was denied adequate medical care for that injury. He was also denied medical care for a pre-existing health condition. This denial of medical care constituted negligence and deliberate indifference by Bureau

71

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

of Prisons employees acting within the scope of their federal employment.

235.    The criminal proceedings against Mr. Kinnison terminated in his favor through the presidential pardon issued on January 20, 2025.

## Katherine Morrison

236.    Katherine Morrison is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally. She was arrested more than one year after January 6, 2021.

237.    Ms. Morrison was appointed a public defender who advised her that the attorney "would be shocked" if she did not receive probation.  This advice was materially incorrect and constituted ineffective assistance of counsel.  By the time of Ms. Morrison's arrest, she had observed that every January 6 defendant who took their case to trial was receiving very lengthy sentences.  She had two very young children at home. Faced with the threat of a lengthy prison sentence and the prospect of leaving her young children without their mother, she accepted a guilty plea.

238.    The government requested 15 months in prison.  The court sentenced Ms. Morrison **to** 8 months in prison, followed by 8 months of home confinement and 2 years of probation.  She ultimately served approximately 6 months due to time credits earned under the First Step Act.

239.    While incarcerated at FCI Hazelton in West Virginia, Ms. Morrison was subjected to conditions that constituted cruel and unusual punishment and tortious conduct by Bureau of Prisons employees. In November, with outdoor temperatures at approximately 10 degrees Fahrenheit, the facility had no functioning heat. Hot water regularly stopped working.  There were visible cracks in the walls through which snow entered the facility.  These conditions constituted negligence and deliberate indifference by Bureau of Prisons employees.

72

240.    Ms. Morrison was subjected to a 5-day lockdown during which her husband and young children had no information about her whereabouts or condition.  The lockdown was imposed not because of any conduct by Ms. Morrison, but because of a fight among other inmates. The failure to notify her family of her status during this lockdown caused her family severe emotional distress and constituted a tortious act.

241.    Male prisoners who claimed to identify as women were housed in Ms. Morrison's unit at FCI Hazelton. Ms. Morrison was in reasonable fear of assault by these individuals.  The Bureau of Prisons' policy of housing biological males in women's facilities without adequate screening or safeguards constituted negligence and deliberate indifference to Ms. Morrison's safety.

242.    Ms. Morrison suffered serious neck and back pain throughout her incarceration. She required spinal fusion surgery, which she was unable to undergo because she was imprisoned. Her request for a medical mattress was denied, and she was given only ibuprofen for her pain. This denial of adequate medical care constituted negligence and deliberate indifference by Bureau of Prisons employees.

243.    The criminal proceedings against Ms. Morrison terminated in her favor through the presidential pardon issued on January 20, 2025.

**Anna Morgan-Lloyd**

244.    The Plaintiff Anna Morgan-Lloyd is a resident of Bloomfield, Indiana. She traveled to Washington, D.C. on January 6, 2021, to attend the political rally and to exercise her First Amendment rights. She entered the Capitol Building and was present for a period of time before leaving.

245.    Ms. Morgan-Lloyd was the first January 6 defendant to be sentenced in all of the

73

January 6 prosecutions, sentenced on June 23, 2021, in *United States v. Morgan-Lloyd*, Case No. 1:21-cr-00164-RCL (D.D.C.).

246.    Ms. Morgan-Lloyd was informed by FBI agents during their investigation that the government was using a geofence warrant, and that agents knew exactly where in the Capitol building she had been and how long she had been there.  That disclosure confirmed that Ms. Morgan-Lloyd's location data had been swept up by a general warrant without individualized probable cause, in violation of the Fourth Amendment.

247.    Ms. Morgan-Lloyd was appointed H. Heather Shaner as her CJA panel attorney. Ms. Shaner is a Washington, D.C.-based criminal defense attorney who, by her own public account, ultimately represented 43 January 6 defendants, every one of whom pleaded guilty.  Not a single one of Ms. Shaner's January 6th clients proceeded to trial.

248.    Ms. Shaner's representation of Ms. Morgan-Lloyd was constitutionally deficient and infected by an undisclosed conflict of interest. Specifically:

    a.  Ms. Shaner explicitly told Ms. Morgan-Lloyd that her mission was to "deprogram" the January 6 defendants — a statement that constitutes direct evidence of an undisclosed conflict of interest and a fundamental breach of the duty of loyalty. An attorney whose stated mission is to alter her client's political beliefs, rather than to advocate for her client's legal interests, cannot provide the effective assistance of counsel guaranteed by the Sixth Amendment.

    b.  Ms. Shaner told Ms. Morgan-Lloyd that the belief that the 2020 presidential election was stolen was a "conspiracy theory" — and communicated this view to her client as settled fact. By prejudging the legitimacy of her client's core political motivation, Ms. Shaner foreclosed avenues of defense that a neutral

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

advocate would have been obligated to explore, and undermined the voluntariness of Ms. Morgan-Lloyd's guilty plea.

c. Ms. Shaner told Ms. Morgan-Lloyd that "all white people are racists" — a statement that attributes a moral defect to the client based on her race, made by the very person who was supposed to be that client's loyal advocate. This statement constitutes racial bias in violation of ABA Defense Function Standard 4-1.6 and D.C. Rule of Professional Conduct 8.4(d).

d. Throughout her time as a CJA "defense lawyer," Ms. Shaner was making an anti-J6er "documentary" film — *Public Defender* (2024), directed by Andrea Kalin and broadcast on PBS — in which she described the "mob mentality" of January 6 participants in terms that equated her clients' conduct with that of Nazi perpetrators. This participation violated ABA Defense Function Standard 4-1.10(h), which prohibits defense counsel from allowing the client's representation to be adversely affected by counsel's personal interest in media attention.

e. In the sentencing memorandum she filed in *United States v. Morgan-Lloyd*, Ms. Shaner reported to the court that her client had read *Bury My Heart at Wounded Knee*, *Just Mercy*, and *Schindler's List* as part of a program of political re-education, and that her client "totally accepts President Biden as the leader of our country." These statements had no legal relevance to the sentencing factors under 18 U.S.C. § 3553(a) and served only Ms. Shaner's personal goal of demonstrating her client's successful political reformation to the court.

249. The combination of Ms. Shaner's "deprogramming" mission, her characterization

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

of her client's political beliefs as a "conspiracy theory," her racial statements, her documentary film participation, and her 100% plea rate across 38 or more January 6 cases demonstrates that Ms. Shaner's representation was not the product of neutral professional judgment but of personal political hostility toward her clients. This constitutes an undisclosed conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984).

250. As a direct and proximate result of Ms. Shaner's constitutionally deficient representation, Ms. Morgan-Lloyd pleaded guilty to charges she did not commit. The United States is liable under the FTCA for the tortious conduct of its officer, the CJA-appointed attorney acting in a quasi-public capacity, that caused Ms. Morgan-Lloyd's guilty plea to be involuntary.

251. The criminal proceedings against Ms. Morgan-Lloyd terminated in her favor through the presidential pardon issued on January 20, 2025.

## Donna Sue Bissey

252. The Plaintiff Donna Sue Bissey is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally. Ms. Bissey and co-plaintiff Anna Morgan-Lloyd walked through open doors of the Capitol, led by an unknown and unidentified provocateur named "Linda." Ms. Bissey and Ms. Morgan-Lloyd exited the Capitol after about 10 minutes.

253. Ms. Bissey became s a co-defendant of Anna Morgan-Lloyd and was the second January 6 defendant to be sentenced in all of the January 6 prosecutions. Despite having a spotless record and being enticed into a false guilty plea with promises of probation, Ms. Bissey was sentenced to 14 days imprisonment. At sentencing, prosecutors argued that traditional presumptions of probation for first time misdemeanants should be jettisoned because J6 was such

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

a serious "attack on democracy."

254.    Ms. Bissey suffered from an autoimmune disorder. While incarcerated, the Bureau of Prisons withheld her medication for this autoimmune condition.  That denial of necessary medical treatment constituted negligence and deliberate indifference by Bureau of Prisons employees acting within the scope of their federal employment, and caused Ms. Bissey to suffer unnecessary pain, suffering, and deterioration of her medical condition.

255.    The criminal proceedings against Ms. Bissey terminated in her favor through the presidential pardon issued on January 20, 2025.

## Quinn Keen

256.    The Plaintiff Quinn Keen is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally. He was subsequently identified, investigated, and prosecuted in connection with the events of January 6th.

257.    Mr. Keen was a victim of Sedition Hunters. He was publicly identified on the Sedition Hunters website under the designation "Shaggy Stash."  This public identification caused Mr. Keen to suffer harassment, reputational harm, and other injuries.

258.    Upon his arrest, Mr. Keen was subjected to DNA swabbing, retinal scanning, and blood collection by federal agents.  The collection of this biological data without adequate legal justification, and the retention of this data in government databases, constitutes a tortious invasion of privacy and an unlawful seizure of biological materials.  The Plaintiffs demand the destruction of all DNA, blood, and other biological identifying information collected from Mr. Keen.

259.    Mr. Keen was subjected to vindictive prosecution when he indicated an intent to defend himself from the charges.  He ultimately took a plea deal and was sentenced to 24 months in federal prison.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

260. The criminal proceedings against Mr. Keen terminated in his favor through the presidential pardon issued on January 20, 2025.

## Joshua Ryan Dale

261. The Plaintiff Joshua Ryan Dale is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally.  He was subsequently identified, investigated, and prosecuted in connection with the events of January 6.

262. Mr. Dale was a victim of Sedition Hunters.  He was publicly identified on the Sedition Hunters website, causing him to suffer harassment, reputational harm, and other injuries. Upon his arrest, Mr. Dale was subjected to DNA swabbing by federal agents, the retention of which in government databases constitutes a tortious invasion of privacy.

263. While incarcerated, Mr. Dale suffered serious deprivations of medical care. Medical treatment for his conditions was repeatedly delayed without adequate justification.  Mr. Dale was also placed in solitary confinement on multiple occasions, in a manner that was disproportionate to any legitimate penological purpose and that caused him serious psychological harm. These conditions constituted negligence and deliberate indifference by Bureau of Prisons employees acting within the scope of their federal employment.

264. The criminal proceedings against Mr. Dale terminated in his favor through the presidential pardon issued on January 20, 2025.

## Matthew Martin

265. The Plaintiff Matthew Martin is a resident of New Mexico and a professional electrical engineer who worked for a contractor connected to the Nevada National Security Site and Los Alamos support work. He traveled from New Mexico to Washington, D.C. for the January 6, 2021 rally.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

266.    On January 6th, Mr. Martin attended the rally and spent time between the rally site, his hotel, and the Capitol area.  He was tired and low on energy.  He entered the Capitol briefly through a doorway that he believed was being permitted for entry by Capitol Police and remained inside for approximately 10 minutes.  Once it appeared that police were clearing the area, he left the building and returned to his hotel.

267.    After returning to New Mexico, Mr. Martin informed his employer that he had gone to Washington and briefly entered the Capitol. His employer suspended him without pay and informed him that an FBI agent wished to speak with him. Mr. Martin hired an attorney, cooperated with the FBI, voluntarily provided phone photographs and other materials, and surrendered to authorities when charges were filed.

268.    Mr. Martin was charged with four misdemeanors.  He was subjected to multiple arraignments and experienced significant delays in receiving discovery.  He was offered a plea agreement, which he declined.  He proceeded to trial and was found not guilty on all charges, becoming one of the first J6er to be acquitted at trial.

269.    Despite his full acquittal, Mr. Martin suffered severe and lasting harm.  He was threatened with a superseding indictment by the presiding judge during the proceedings, a threat that constituted an abuse of the judicial process and caused Mr. Martin to suffer severe emotional distress.  He was subjected to home searches by pretrial services.  His security clearance and employment prospects were severely damaged by the prosecution, and it took a significant period of time for records to reflect the not-guilty outcome.  He continues to struggle to regain employment in his field.

270.    Mr. Martin's acquittal demonstrates that the government lacked probable cause to prosecute him.  The initiation and continuation of criminal proceedings against Mr. Martin without

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

probable cause, and the threat of a superseding indictment to coerce a guilty plea, constituted malicious prosecution and abuse of process.

## Russell Alford

271.    The Plaintiff, Russell Alford, is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally.  He witnessed police officers spraying mace directly into the faces of unarmed attendees.  He entered the Capitol through the metal detector area and remained in the hallway entrance near the door for the entirety of his approximately 11 minutes inside the building. He never walked further into the Capitol.

272.    Mr. Alford was charged with the four standard misdemeanors on Mar 22, 2021. threatened by the Department of Justice that if he did not accept a plea agreement, the government would charge him with a felony, a direct invocation of the Vindictive Prosecution Program. This threat was made notwithstanding the minimal nature of Mr. Alford's conduct.  Prosecutors also filed motions to preclude virtually all of Mr. Alford's defenses.

273.    Despite being faced with this threat, Mr. Alford proceeded to trial.

274.    Mr. Alford was convicted by a jury of all four counts on Oct. 5, 2022, including a count of "disorderly conduct," despite doing nothing disorderly.

275.    Mr. Alford was sentenced to 365 days in federal prison, a sentence that was grossly disproportionate to his conduct, which consisted of standing near the entrance of the Capitol for 11 minutes without engaging in any violence, destruction, or theft.

276.    Mr. Alford was incarcerated at a federal facility in Mississippi. For a period of three months, the facility had no functioning hot water. This condition constituted negligence and deliberate indifference by Bureau of Prisons employees acting within the scope of their federal employment.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

277.    While incarcerated, Mr. Alford contracted a bacterial infection that has not been fully resolved. He developed a hernia that remains untreated as of the date of this Complaint.  He was diagnosed with high blood pressure during his incarceration.  He requested a jock strap to prevent his intestines from protruding through his hernia, describing the situation as needing to "keep his intestines from falling out all over the place."  This request was denied or inadequately addressed, constituting deliberate indifference to a serious medical need.

278.    Mr. Alford was housed with repeat violent offenders, a housing assignment that was inappropriate for a first-time, nonviolent offender and that exposed him to a heightened risk of violence.

279.    Mr. Alford's Social Security benefits were stopped for the entire year of his incarceration. Upon his release, he was informed that he was required to repay two months of Social Security payments that had been sent to him prior to the government "becoming aware" of his incarceration. This claw-back of benefits caused Mr. Alford additional financial hardship.

280.    The criminal proceedings against Mr. Alford terminated in his favor through the presidential pardon issued on January 20, 2025.

**Joshua Youngerman**

281.    The Plaintiff Joshua Youngerman is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally.  He walked into the Capitol through an open door and quickly exited the Capitol through the same door. He held banners, flags and signs in protest of the error-ridden 2020 election. Never di he touch or harm any person or property.

282.    In June of 2021, the FBI requested that Mr. Youngerman come to local San Diego FBI headquarters for questioning.  Mr. Youngerman complied and found himself in a custodial

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

interrogation room where he was not free to leave.  He was thereafter repeatedly questioned although he asked for an attorney several times.

283.   Two years later, Mr. Youngerman was prosecuted in connection with the events of January 6th.  He was charged on July 24, 2023 with 5 misdemeanors, including a charge of "stepping or climbing on" a feature of the Capitol.

284.   Nine months later, when Mr. Youngerman turned down a plea offer and insisted on a trial, he was vindictively indicted for a false charge of "obstructing an official proceeding," a 20-year felony.

285.   When the Supreme Court invalidated the 1512(c)(2) statute in July 2024, the United States vindictively added yet another false felony charge, "conspiracy to impede federal officers," on 08/21/24.

286.   The malicious and vindictive case was dismissed upon motion by the United States on Jan. 22, 2025.

287.   Mr. Youngerman's injuries and damages will be further described at trial.

**Tucker Andrew Weston**

288.   The Plaintiff Tucker Andrew Weston is a patriotic American citizen who traveled to Washington, D.C. on January 6, 2021, to attend the political rally.

289.   While at the Capitol, Mr. Weston was shoved into crowd chaos, where he momentarily made contact with a Capitol Police officer.

290.   Mr. Weston put his hands up to try to de-escalate and was thereafter falsely indicted for a bogus "assaulting, resisting, or opposing an officer" charge.

291.   Mr. Weston was identified by Sedition Hunters, a secretly-government-funded entity which stalked and harassed J6ers.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

292.   On October 19, 2022, the government executed a no-knock warrant at around 4:30 a.m. in violation of the arrest warrant.  Agents broke down the door to the side of Mr. Weston's house and started throwing flash bang grenades into the house.

293.   The government drove an MRAMs-type assault vehicle onto Mr. Weston's yard with an agent behind a cannon turret.  The turret was facing the front door.  Agents had tipped off the media and had a media tent set up.  This was about 10 days before the midterm elections.  A public defender later told Mr. Weston he was lucky to be alive because it was obvious the government was trying to instigate a violent incident.

294.   Mr. Weston was separated from his family and placed in a vehicle handcuffed in his underwear.  The government shut off all the streets in the area.

295.   Men wearing Tyvek suits entered the house.  When Mr. Weston arrived back at his house after booking, he found the front door open and the entire inside of the house trashed.  Even the crawl space and attic were torn apart, and insulation had been ripped out everywhere.  Entire contents of rooms had been dumped in the middle of floors.  A dresser and mattress were turned over.   It appeared that agents had deliberately stomped on property to damage it.

296.   When Mr. Weston traveled at airports he was pulled aside and subjected to invasive searches due to his status of being on a terror watch list over January 6th.  His phone was seized and copied at airports.  Sometimes he missed his flights.

297.   Mr. Weston was coerced into a plea deal and was sentenced to two years in prison on May 24, 2024.  His father died while he was in prison.

298.   While in isolation in federal prison, Mr. Weston lost 20 pounds and suffered severe health problems. In prison Mr. Weston was singled out for harsh treatment due to his status as a J6er.  He spent 4.5 months of diesel therapy, traveling across the country, and kept on lockdown

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

23 hours per day.

299.    Mr. Weston continues to suffer weaponized harassment such as IRS audits each year.  He lost two careers as a result of his J6 ordeal.  He was fired as a county employee and was deprived of his bus driving career and pension.  He continues to struggle for employment and financial stability.

300.    The criminal proceedings against Mr. Weston terminated in his favor through the presidential pardon issued on January 20, 2025.

## Carol O'Neal Kicinski

301.    The Plaintiff Carol O'Neal Kicinski is a resident of Dunedin, Florida. She is the founder of *Simply Gluten Free* magazine and website, a nationally syndicated television chef appearing on *Daytime* (broadcast on NBC-affiliated WFLA-TV, Tampa), and the author of multiple cookbooks.  She is the founder and president of Simply Gluten Free Omnimedia, Inc. and Edgewater Park Media, Inc.

302.    Ms. Kicinski traveled from Florida to Washington, D.C. on January 5, 2021, to attend the Stop the Steal rally. On January 6, she attended the rally at the Ellipse and subsequently made her way to the Capitol.  She entered the Capitol Building through the open Senate Wing Door and was present inside the Capitol for approximately 20 minutes. She was subsequently charged in Case No. 1:22-cr-00061-RBW (D.D.C.).

303.    Ms. Kicinski was a victim of the unconstitutional geofence warrant. Google location data obtained pursuant to a search warrant was used to identify her presence at the Capitol. This evidence was obtained through a general warrant without individualized probable cause, in violation of the Fourth Amendment.

304.    Ms. Kicinski pleaded guilty on November 8, 2022, to Count 1 of the Superseding

84

Information, Entering and Remaining in a Restricted Building, 18 U.S.C. § 1752(a)(1), a Class A misdemeanor. She was sentenced on June 27, 2023, by Judge Reggie B. Walton to an outrageous sentence of 20 days incarceration, 1 year of supervised release, $500 in restitution, and a $25 special assessment. The government had requested 30 days of incarceration.

305.    As a direct and proximate result of her arrest, prosecution, and conviction, Ms. Kicinski's media career was severely disrupted. At the time of her sentencing, the government described her as "recently unemployed." Her magazine, television career, and cookbook business — which she had built over more than 15 years, suffered severe reputational and financial damage as a direct result of the government's prosecution.

306.    The criminal proceedings against Ms. Kicinski terminated in her favor through the presidential pardon issued on January 20, 2025.

## Jon Nicholas Heneghan

307.    The Plaintiff Jon Nicholas Heneghan is a resident of the Tampa Bay area of Florida. He is a professional poker player and the winner of a 2005 World Series of Poker gold bracelet (Event #37, $1,000 No-Limit Hold'em), earning $611,015 in that tournament. At the time of his sentencing, he was working as a rideshare driver for Uber and Uzurv.

308.    Mr. Heneghan traveled from Florida to Washington, D.C. on January 5, 2021, to attend the Stop the Steal rally. On January 6, he attended the rally and subsequently made his way to the Capitol. He entered the Capitol Building through the Senate Wing Door and was present inside the Capitol for approximately 20 minutes. He was subsequently charged in Case No. 1:22-cr-00061-RBW (D.D.C.), the same case as Ms. Kicinski.

309.    Mr. Heneghan was a victim of the unconstitutional geofence warrant. Google

85

location data obtained pursuant to a search warrant was used to identify his presence at the Capitol. This evidence was obtained through a general warrant without individualized probable cause, in violation of the Fourth Amendment.

310.    Mr. Heneghan pleaded guilty on November 8, 2022, to Count 1 of the Superseding Information, Entering and Remaining in a Restricted Building, 18 U.S.C. § 1752(a)(1), a Class A misdemeanor.  He was sentenced on June 27, 2023, by Judge Reggie B. Walton to 20 days incarceration, 1 year of supervised release, $500 in restitution, and a $25 special assessment.  The government had requested 30 days of incarceration.

311.    As a direct and proximate result of his arrest, prosecution, and conviction, Mr. Heneghan suffered severe reputational harm, financial loss, and emotional distress. His ability to earn income as a professional poker player and rideshare driver was disrupted by the prosecution and its collateral consequences.

312.    The criminal proceedings against Mr. Heneghan terminated in his favor through the presidential pardon issued on January 20, 2025.

313.    As a direct result of these malicious, selective, and vindictive prosecutions, each of the Plaintiffs suffered severe damages, including loss of liberty (incarceration or pretrial detention), loss of employment and income, emotional distress, reputational harm, legal defense costs exceeding hundreds of thousands of dollars, and ongoing collateral consequences.

314.    The criminal proceedings have terminated in all the Plaintiffs' favor.

### CLAIMS FOR RELIEF

### Count I – Malicious Prosecution
(FTCA: All the Plaintiffs Against United States)

315.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

and incorporate them in this Count as though they are fully restated herein.

316.    United States' employees (including all the officials described above) initiated criminal proceedings against all of the Plaintiffs.

317.    The proceedings were initiated without probable cause.

318.    The proceedings were continued with actual malice and for improper purposes (political persecution, retaliation, and to deter protected First Amendment activity).

319.    The proceedings terminated in the Plaintiffs' favor.

320.    The Plaintiffs suffered damages as a direct and proximate result.

321.    The United States is liable under the FTCA for these torts committed by its investigative and law enforcement officers within the scope of their employment. 28 U.S.C. §2680(h).  The United States' officers and agents fabricated and exaggerated evidence, withheld exculpatory material, and pursued the cases despite the absence of probable cause that the Plaintiffs had committed the crimes alleged.

322.    The criminal proceedings have terminated in the Plaintiffs' favor through acquittals, dismissals, and presidential pardons issued on January 20, 2025, which constitutes a favorable termination for purposes of a malicious-prosecution claim.

323.    As a direct and proximate result of the Government's tortious conduct, each the Plaintiff has suffered and continues to suffer damages in excess of $1 million, including but not limited to medical expenses, lost wages, pain and suffering, emotional distress, loss of liberty, loss of consortium, and other consequential damages.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b.  Award compensatory damages in an amount to be proven at trial, but not less than

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

$1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

## Count II – Selective Prosecution/Abuse of Process
(FTCA – All Plaintiffs Against United States)

324.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above and incorporate them in this Count as though they are fully restated herein.

325.    The United States used the legal process improperly (to wit: criminal prosecutions) in a manner that is not justified by the underlying legal action.

326.    The United States had ulterior motives and used the legal system to harass, intimidate, coerce, and inflict emotional distress upon the Plaintiffs rather than to achieve a legitimate legal objective.

327.    The Plaintiffs suffered harm as a result of the misuse of the legal process.  This harm included economic injury, emotional distress, and other damages as described in this complaint.

328.    The defendant United States acted intentionally or with a reckless disregard for the consequences of its actions.

88

329. The prosecutions described in this complaint were selectively and vindictively initiated, maintained and pursued against the Plaintiffs because of the Plaintiffs' political affiliation, viewpoint, and association with the Trump candidacy or movement, while similarly situated individuals of opposing political views were not prosecuted. This constitutes selective and vindictive prosecution and abuse of process under District of Columbia common law and violates the Fifth Amendment's equal protection and due process guarantee.

330. As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

331. The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

332. The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

333. As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and -mental injury, including, but not limited to-: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that HICKS was unable to function in their daily lives as they did before the injuries.

334. The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

a.  Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b.  Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

## Count III - Federal Tort Claims Act – Negligence involving Personal Property
(All Plaintiffs Against the United States of America)

335.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above and incorporate them in this Count as though they are fully restated herein.

336.    The United States had a duty to exercise reasonable care in handling the Plaintiffs' seized property.

337.    The FBI, an agency of the United States government, seized the Plaintiffs' personal property following the events of January 6, 2021.

338.    The FBI seized cell phones, computers, mail and other items of property from the Plaintiffs.

339.    The United States breached its duty by failing to exercise reasonable care in handling the Plaintiffs' property.

90

340.    While in federal custody, the Plaintiff's property was damaged, lost, or stolen.

341.    The United States' breach of its duty caused damage to, loss of, or theft of the Plaintiffs' property.

342.    As a direct and proximate result of the United States' breach of its duty, the Plaintiffs have suffered damages in the amounts to be established at trial.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b.  Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g.  Expungement of all records of criminal offenses.

h.  Destruction of all DNA, blood, and other identifying biological information.

**Count IV - Federal Tort Claims Act – Intentional Infliction of Emotional Distress**
(All Plaintiffs Against the United States of America)

343.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above and incorporate them in this Count as though they are fully restated herein.

344.    The United States and its officers described in Paragraphs 1 through 162 engaged in extreme and outrageous conduct.

91

345.    The United States' officers engaged in this conduct intentionally.

346.    The Plaintiffs each suffered public ridicule, mockery, and severe humiliation due to the branding of them as insurrectionists, rioters, being anti-American, seditionists, traitors, violent, and besmirching the label of J6er and attaching that label to the J6ers with the negative ramification, imprisonment, wrongful arrest, from which the Plaintiffs have suffered emotional paid, a loss of enjoyment of life, lost income, loss of their choices of means of earning a living, loss of revenue from failed businesses and unobtainable employment.

347.    The conduct of the conspirators was outrageous.

348.    As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

349.    The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

350.    The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

351.    As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and -mental injury, including, but not limited to-: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that HICKS was unable to function in their daily lives as they did before the injuries.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

352.    The United States' conduct caused the Plaintiffs to have severe emotional distress.

353.    The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

b.  Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

### Count V –Abuse of Process/ Vindictive Prosecution

(FTCA – all plaintiffs against the United States)

309.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above and incorporate them in this Count as though they are fully restated herein.

310.    The United States and its prosecutors retaliated against plaintiffs for defending themselves by filing vindictive, malicious, bogus superseding felony indictments or punishing them for exercising their constitutional rights.

311.    This was in accordance with a knowingly unconstitutional pattern and practice of

93

the Garland Justice Department in J6 cases.  The majority of J6ers who exercised their right to misdemeanor trials were similarly punished with false felony charges.

312.    Word of this unconstitutional program and abuse of process spread widely among J6ers, compelling other accused J6ers to falsely plead guilty to crimes they didn't commit.

313.    The United States, implemented, directed, or failed to adequately train and supervise a policy, custom, or practice within the DOJ and U.S.  Attorney's Office for the District of Columbia whereby federal prosecutors were encouraged or permitted to file superseding indictments adding felony charges against January 6 Defendants who were initially charged only with misdemeanors and who refused to plead guilty and instead demanded their constitutional right to trial.

314.    This policy constituted abuse of process, and vindictive prosecution in violation of the Fifth Amendment's Due Process Clause and was the moving force behind the unconstitutional actions against the Plaintiffs.

315.    These false felony prosecutions were vindictively initiated and pursued against the majority of similarly situated J6 Defendants) because they exercised their constitutional right to refuse a misdemeanor plea and demand a trial.  Misters Garland and Graves, through unwritten policy, custom, directive, or deliberate indifference in training and supervision, caused federal prosecutors to file superseding false felony indictments in retaliation.  Garland and Graves failed to properly train and supervise prosecutors regarding the prohibition on retaliatory charging decisions, despite the obvious risk of  tortious and constitutional injury.

316.    In each case, the criminal proceeding terminated in the Plaintiffs' favor, either by dismissal with prejudice, acquittal on key counts, or executive clemency that nullified the convictions and restored the Plaintiffs' rights.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

317.    The United States is liable under the FTCA for these torts (abuse of process and malicious prosecution) committed by its investigative and law enforcement officers within the scope of their employment.  28 U.S.C.  § 2680(h).

318.    In every essence, this insidious practice deprived J6ers of their constitutional right to demand that allegations be subjected to fair adversarial trials.

319.    As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

320.    The above-named employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

321.    The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

322.    As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and -mental injury, including, but not limited to-: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that HICKS was unable to function in their daily lives as they did before the injuries.

323.    The Plaintiffs suffered damages as a direct and proximate result.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Enter judgment in favor of the Plaintiffs and against the Defendants on all counts;

95

b.  Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

### Count VI - Tortious Civil Conspiracy (under law of District of Columbia)
(All Plaintiffs versus the United States of America)

354.    The Plaintiffs aver all of the allegations stated in Paragraphs 1 through 314, above and incorporate them in this Count as though they are fully restated herein.

355.    The United States and its officers described in Paragraphs 1 through 296 forged a cooperation and meeting of minds between two or more of its officers to commit a wrongful act, and an overt act in furtherance, resulting damages.

356.    The United States is liable for the tortious conspiracy of its employees, including all branches of government which resulted in the wrongful arrest, the wrongful imprisonment, the wrongful branding as criminals, insurrectionists, seditionists, traitors, impeding their rights by such labeling or by making records and including the Plaintiffs on lists which made it difficult to travel, to run a business, or earn a living.

357.    Wrongful acts by the United States include Malicious Prosecution, Abuse of

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

Process, Intentional Infliction of Emotional Distress, and Trespass to Chattels.

358.     Overt acts by United States officers include:

A.     Brady violations and the withholding of exculpatory evidence on a mass scale.

B.     Unlawful searches and seizures (and trespasses) based on bogus general "geofence warrants" whereby the government seized every cell phone number at the Capitol on January 6th.

C.     Falsifying evidence and the notion that the Secret Service had restricted vast areas of the U.S. Capitol on January 6, 2021—while knowing the Secret Service had never cast such restrictions.

D.     Intentionally destroying, stealing, or breaking the property of J6ers, including that of the plaintiffs.

E.     The imposition of a bogus "obstruction of official proceedings" statute, knowing that the statute was never intended to apply to disorderly conduct by protestors.

F.     The rigging of trials so that J6ers could not prevail.

G.     The false placement of court venue in the courthouse where every judge in the courthouse was an interested witness to the events.

H.     The burying of terabytes of discovery in databases which were inaccessible to the vast majority of J6ers.

I.     The control and monitoring of defense attorneys use of discovery databases.

J.     The monitoring of attorney/client communications of J6ers.

K.     The concealment of hundreds of undercover government operators and provocateurs among the crowds on January 6th.

359.     As a result of the conduct of the employees of the United States' employees the Plaintiffs have suffered emotional distress.

THE TICKTIN LAW GROUP
270 SW NATURA AVENUE, DEERFIELD BEACH, FLORIDA 33441
TELEPHONE: (954) 570-6757

360.    The abovenamed employees, including the police, the prosecutors, the judges, and prison officials' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

361.    The conduct of the employees of the United States, regarding each Plaintiff was such that an average member of the communities in which the conduct occurred would arouse him or her resentment against the United States and lead him or her to exclaim, "Outrageous!"

362.    As a result of the extreme and outrageous actions taken by the Conspirators, each and every one of the Plaintiffs suffered, and will likely continue to suffer physical and -mental injury, including, but not limited to-: (1) severe emotional distress from the embarrassment, shame, worry, and humiliation; (2) depression; (3) anxiety; (4) tension, insomnia, and headaches; and (5) heart palpitations, such that HICKS was unable to function in their daily lives as they did before the injuries.

363.    The United States' conduct caused the Plaintiffs to have severe emotional distress.

364.    The Plaintiffs demand trial to show and establish the evidence of such severe emotional distress.

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Enter judgment in favor of the Plaintiffs and against the Defendant on all counts;

b.  Award compensatory damages in an amount to be proven at trial, but not less than $1,000,000 per Plaintiff;

c.  Award a declaration that the United States of America's actions in damaging, losing, or stealing the Plaintiff's property violated the Plaintiff's constitutional and statutory rights pursuant to 28 USCS § 2201;

98

d.  Award attorneys' fees and costs pursuant to applicable law;

e.  Award pre- and post-judgment interest;

f.  Grant such further and other relief as this Honorable Court may deem just and proper.

g. Expungement of all records of criminal offenses.

h. Destruction of all DNA, blood, and other identifying biological information.

Respectfully submitted,                    Dated: August 4, 2026

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

_/s/ *Peter Ticktin*____ ____
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
Serv512@LegalBrains.com
ROGER ROOTS, ESQUIRE
Rhode Island Bar No. 6752
Serv517@LegalBrains.com

99